PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO, representado por su Presidente, RUBÉN BERRÍOS MARTÍNEZ, demandante y apelado, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO y OTROS, demandados y apelantes.

*Número:* O-80-68          *Resuelto:* 14 de febrero de 1980

*Héctor A. Colón Cruz, Procurador General,* y *Justo Gorbea Varona, Subprocurador General Interino,* abogados de los apelantes

Estado Libre Asociado y Secretario de Hacienda; *Miguel A. Pagán, Eunice Sein Llompart* y *José A. Carlo,* abogados del Administrador General de Elecciones, apelante; *Héctor M. Laffitte* y *Héctor Reichard, Jr.*, abogados del New Democratic Party of Puerto Rico, interventor; *Luis Rivera Lacourt,* abogado del Partido Independentista Puertorriqueño, apelado.

RESOLUCIÓN

Examinados los autos, se deniegan las mociones radicadas por el Administrador General de Elecciones y otros para que, en auxilio de la jurisdicción de este Tribunal, se paralice el interdicto permanente dictado por el Tribunal Superior por voz de la Hon. Carmen Sonia Zayas en este caso. Las razones para la continuación del interdicto dictado se expresan básicamente en *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978).

Lo aquí resuelto en nada afecta el uso de los edificios escolares autorizado por la Ley Núm. 94 de 30 de junio de 1975, 18 L.P.R.A. sec. 126a. Véase nuestra Resolución de 27 de setiembre de 1978 en *P.S.P.* v. *E.L.A.*, supra.

El Señor Juez Asociado, Hon. Antonio S. Negrón García, emitió un voto particular concurrente. Los Señores Jueces Asociados, Hons. Carlos V. Dávila y Ángel M. Martín, emitieron votos disidentes.

Lo acordó el Tribunal y certifica el señor Secretario.

(Fdo.) Ernesto L. Chiesa
*Secretario General*

—O—

Voto disidente del Juez Asociado Señor Dávila.

San Juan, Puerto Rico, a 14 de febrero de 1980

Sin entrar a considerar si lo dispuesto en el Art. 32([1]) de la nueva Ley de Primarias, Ley Núm. 6 de 24 de septiembre de

---

([1]) Dispone así:

"Interpretación de los Resultados de las Primarias Presidenciales. Siempre que los procedimientos de primarias presidenciales sean administrados e implementados desde su inicio hasta cumplimentación final por el Administrador Estatal de

1979, salva los defectos apuntados en el dictamen de este Tribunal en el caso de *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978), disiento del acuerdo del Tribunal al negarse a dejar sin efecto el entredicho dictado por el Tribunal Superior en virtud de lo expresado en mi disenso en el caso antes mencionado.

Ahora bien, aparte de lo anterior, considero irrazonable el acuerdo del Tribunal. Veamos porqué.

Es sabido que toda ley se presume constitucional y que la Asamblea Constituyente estableció en la Sec. 4 del Art. V de la Constitución que "[n]inguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal de acuerdo con esta Constitución o con la Ley". El obvio propósito de esta disposición es salvaguardar la voluntad del pueblo representado en la Asamblea Legislativa. Siendo esto así, y alegándose en el presente recurso que en la nueva Ley de Primarias, Ley Núm. 6 de 24 de septiembre de 1979, se ha subsanado la principal deficiencia de que adolecía la anterior ley—Ley Núm. 102 de 24 de junio de 1977—según se resolvió en *P.S.P.* v. *E.L.A.*, supra resulta irrazonable e injusto mantener en toda su fuerza y vigor el interdicto dictado por el Tribunal Superior. El no suspenderlo convierte en académico el recurso en lo que se relaciona a las primarias a celebrarse el 17 de febrero de 1980. Por otro lado, si se suspenden los efectos del interdicto convierte en académico el caso de la parte demandante. La única forma justa y razonable de resolver este dilema es adoptando una resolución siguiendo los términos de la que adoptó el Tribunal en el caso de *P.S.P.* v. *E.L.A.*, y teniendo presente lo dispuesto en el Art. 4 de la Ley Núm. 6 antes mencionada al efecto de que "[l]as primarias presidenciales

Elecciones, ni el número de los participantes, ni los resultados de ningún otro elemento del proceso de las mismas y/o demás procedimientos que se lleven a tenor con lo dispuesto en esta ley podrá ser oficialmente interpretado por el Gobierno de Puerto Rico para propósito alguno como indicador en relación con las preferencias que tenga o pueda tener nuestro pueblo o un sector del mismo en cuanto al asunto del status político, ni en cuanto a la dirección, si alguna, por la cual deba o pueda encaminarse Puerto Rico en términos de cambios a su actual status."

se celebrarán en la fecha que cada partido político afiliado determine, pero no antes del tercer domingo de febrero ni después del 31 de marzo del año en que deban celebrarse las elecciones presidenciales en los Estados Unidos".

Así, para proteger los intereses de ambas partes en el litigio la resolución dictada en el día de hoy por el Tribunal debió consignar que el recurso se resolvería no más tarde del 22 de febrero de 1980 de suerte que las partes tuvieran oportunidad de posponer las primarias y revisar el dictamen emitido y proteger sus derechos solicitando remedios ante el Tribunal Supremo de los Estados Unidos en auxilio de su jurisdicción.

—O—

Voto disidente del Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 14 de febrero de 1980

Disiento de la decisión del Tribunal que deniega la paralización del entredicho dictado por el Tribunal Superior contra el Administrador General de Elecciones y el Secretario de Hacienda de Puerto Rico.

Este Tribunal basado en lo resuelto en *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978), ha convertido en ilusorios los recursos de apelación instados en tanto en cuanto afectan el desembolso de fondos para las primarias del Partido Republicano de Puerto Rico a celebrarse dentro de tres días. Al así actuar considero que ha anticipado su criterio en cuanto a los méritos de los recursos presentados por el Estado Libre Asociado de Puerto Rico, el Secretario de Hacienda y el Administrador General de Elecciones, así como la solicitud de intervención del New Democratic Party of Puerto Rico.

I

En mi opinión disidente en *P.S.P.*, supra, expresé mi criterio sobre la facultad de la Asamblea Legislativa para disponer de propiedades y fondos públicos para fines públicos

conforme lo dispone la Sec. 9 del Art. VI de la Constitución de Puerto Rico.

Allí expresé que:

"El concepto de 'fin público', a falta de definición en la Constitución, ha de ser moldeado por la Asamblea Legislativa que es la rama de gobierno que tiene la facultad primaria de hacer la determinación, por mandato constitucional, estando dicho poder subordinado a la soberanía del pueblo. Su facultad, como he dicho anteriormente, es amplia y abarcadora, siendo sus miembros los representantes directamente electos, por el pueblo para ejercer la función legislativa, con todos los medios a su disposición para hacer las determinaciones que correspondan luego de hacer los estudios y consultas de todos los factores envueltos, tales como los beneficios que habrá de derivar el pueblo de las medidas que adopte y previa las deliberaciones entre sus componentes.

El concepto 'fin público' y la latitud que tiene la Legislatura para determinar su alcance fue interpretado por primera vez, durante la vigencia de la Ley Jones, por este Tribunal en *McCormick* v. *Marrero, Juez*, 64 D.P.R. 260 (1944) al declarar:

'La Legislatura tiene amplia discreción para determinar qué es lo que constituye un fin público y para tomar aquellas medidas que a su juicio promuevan el bienestar de la comunidad. No es función de los tribunales la de expresar opinión sobre la sabiduría o conveniencia de una medida legislativa. Si ésta contiene elementos de beneficio público y el propósito que se trata de realizar es de carácter público, la cuestión en cuanto al beneficio que haya de recibir el público debe ser resuelta por la Legislatura y no por los tribunales. . . .' pág. 267.

Luego en *P.R. Telephone Co.* v. *Tribl. Contribuciones*, 81 D.P.R. 982 (1960) (Serrano Geyls, J.), al considerar el poder de imposición de tributos que confería la Carta Orgánica de 1917 a la Legislatura y los fines para los que dichas contribuciones habrían de ser utilizadas, concluimos a la luz del significado lógico y corriente de las palabras usadas, de la gravísima importancia del poder fiscal, de la intención del Congreso 'de dotar a Puerto Rico con poderes de gobierno similares a los de un estado, y de la práctica invariable de más de medio siglo, que la frase 'para los fines de los gobiernos insular y municipal' de la sec. 3 de la Carta Orgánica no tiene un significado más estrecho que la frase 'para un fin público', limitativa de los poderes del Congreso y los estados'. Págs. 994–995.

Toda vez que la referida disposición de la Carta Orgánica de

1917 ata la imposición de tributos con los fines a que éstos han de dedicarse al ámbito de poder de la Legislatura para imponer tributos queda limitado éste a los fines en que habrán de utilizarse los tributos. La función judicial para revisar, tanto la imposición de contribuciones como los fines a que se destinen, según expresamos en *P. R. Telephone* es extremadamente reducida, y al efecto dijimos:

'A los criterios usuales de autolimitación que guían 'la grave y delicada función' judicial de juzgar la validez constitucional de las medidas legislativas—*E. L. A.* v. *Aguayo*, 80 D.P.R. 552, 595–597 (1958)—se une en este caso la especial circunstancia de que la determinación del legislador tiene por base variados elementos de la política pública cuyo escrutinio está fuera de la competencia de los jueces.' Pág. 996.

Allí citamos con aprobación jurisprudencia federal en torno al problema de la discreción legislativa al decir:

'En repetidas ocasiones el Tribunal Supremo federal ha fijado la profundidad de las incursiones judiciales en esta área. En *Carmichael* v. *Southern Coal Co.*, 301 U.S. 495, 514–515 (1937) el Tribunal explicó que desde la adopción de la Enmienda XIV los estados sólo pueden imponer contribuciones para un fin público y no para propósitos privados, pero que los requisitos del debido procedimiento dejan 'campo libre para el ejercicio de una amplia discreción legislativa al determinar qué erogaciones servirán el interés público'. Esa discreción incluye, desde luego, la asignación de fondos para el 'bienestar general'. 'Las maneras de beneficiar el interés público están peculiarmente dentro del conocimiento de Legislatura' y 'es a ésta y no a los tribunales a la que corresponde el deber y la responsabilidad de escoger entre los posibles métodos'. Por consiguiente para justificar la intervención de un tribunal se requiere 'un caso claro de desviación de cualquier propósito público que razonablemente pudiera concebirse', o como se dijo en *Helvering* v. *Davis*, 301 U.S. 619, 640 (1937) 'un despliegue de poder arbitrario, no una demostración de juicio'. Y esa autoridad judicial, se añadió en *Everson* v. *Board of Education*, 330 U.S. 1, 6 (1947), debe ejercitarse 'con la más extrema cautela'.' 81 D.P.R. págs. 996–997.

También nos referimos allí a lo que constituía 'el fin público' al expresar:

'El concepto de 'fin público' no es uno estático, atado de por siempre a las ideas que en un momento histórico particular definieron los poderes y responsabilidades del gobierno. Está, por el contrario indisolublemente ligado al bienestar general y,

como éste, tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica y los problemas peculiares que éstas crean, y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad democrática altamente compleja. *Helvering* v. *Davis, supra*, pág. 641. Debe recordarse que la 'Enmienda XIV no privó a los estados de su facultad de enfrentarse a problemas que anteriormente habían sido dejados para ser resueltos por los individuos.' *Everson* v. *Board of Education, supra*, pág. 7.' Pág. 997."

## II

Al establecer el sistema de primarias presidenciales[1] compulsorias el legislador plasmó en la exposición de motivos de dicha pieza legislativa el reconocimiento del "fin público" perseguido. Me permito citar a continuación algunas partes pertinentes de dicha exposición:

"El preámbulo de la Constitución de Puerto Rico establece como factor determinante en nuestra vida, la ciudadanía de los Estados Unidos de América y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas. La participación de los puertorriqueños en los procesos políticos de nuestra Nación está acorde con lo consignado en el Preámbulo de la Constitución de Puerto Rico.

El proceso político para las elecciones presidenciales de 1980 ya se ha iniciado en Puerto Rico. El Partido Republicano tiene un organismo directivo central y se encuentra en un proceso de reorganización. El Partido Demócrata, por otro lado, en una elección interna o primaria, en la cual participaron más de 350,000 puertorriqueños, eligió 200 delegados estatales, que constituyen su Organismo Directivo Central y que es el equivalente de una Convención o Asamblea Estatal.

Es de conocimiento general el interés que han demostrado nuestros ciudadanos de participar activamente en el proceso de nominación de los candidatos de los distintos partidos políticos nacionales aún dentro de las limitaciones del actual marco jurídico político de Puerto Rico. Ello se ha hecho evidente a través de los años, ya que hace décadas que distinguidos puertorriqueños vienen

---

[1] Ley Núm. 6 de 24 de septiembre de 1979.

participando en representación de Puerto Rico como delegados en las convenciones nominadoras de los partidos nacionales.

Ese interés extraordinario del pueblo puertorriqueño por la participación en las actividades y procesos decisionales de los partidos políticos nacionales de los Estados Unidos, quedó dramáticamente demostrado durante las elecciones internas o primarias especiales que se llevaron a cabo en Puerto Rico durante el mes de octubre de 1978 y en las cuales participaron más de 350,000 puertorriqueños, lo que constituye una cantidad sustancial de nuestro electorado, ya que es equivalente a una cuarta parte de los electores que participaron en las elecciones generales de 1976. Hubiese sido claramente imposible llevar a cabo dicha actividad mediante la utilización del viejo sistema denominado como 'caucus'. La organización de tal actividad fue localmente celebrada conforme a las disposiciones de la Ley Núm. 102 de 24 de junio de 1977, conocida como 'Ley de Primarias Presidenciales Compulsorias'. De no haberse utilizado el sistema de primarias una cuarta parte de nuestro electorado tal vez hubiese estado expuesta al riesgo de la violencia corporal o a la intimidación de la conciencia. El propósito principal de la presente ley, al igual que lo fue el de su legislación antecesora, es el de proveer un sistema racional y seguro que viabilice las manifiestas ansias de nuestros ciudadanos de participar activamente en los procesos de selección de los delegados puertorriqueños que participan en las convenciones nominadoras de los partidos nacionales, así como en los procesos internos de dichos partidos, como es el de redactar la plataforma de cada partido nacional que eventualmente pueda constituirse en el programa de gobierno de la nación. Existe en el votante un legítimo interés de seleccionar libremente las personas que habrán de representarle en la confección del programa de gobierno de cada Partido Nacional.

.    .    .    .    .    .    .    .

La aprobación de esta ley, como lo requirió su antecesora, probablemente demande la erogación de fondos públicos para poner en vigor los altos propósitos de participación democrática y paz social que la inspiran.

El Artículo VI de la Sección 9 de la Constitución de Puerto Rico expresa: 'solo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del estado y en todo caso por autoridad de ley'. La Asamblea Legislativa de Puerto Rico, al aprobar esta legislación, provee con ella la autoridad de ley necesaria, para que, en su día, se autorice la erogación de fondos públicos y la utilización de las

propiedades del pueblo necesarias para dar cumplimiento cabal al fin e interés públicos que quedan expresados en los párrafos que preceden."

Ante tan diáfanas manifestaciones es altamente impropio y contrario a la función de esta Corte, sustituir el criterio legislativo y consignar que no hay fines públicos presentes. A las ramas políticas, que están en contacto con el pueblo, les compete auscultar el interés comunitario. Nuestra invasión de esa función podría convertir el Poder Judicial en un principado. Los jueces no estamos exentos de la norma que proscribe el abuso del derecho. *Soriano Tavárez* v. *Rivera Anaya*, 108 D.P.R. 663 (1979).

El amplio poder de la Asamblea Legislativa para determinar que las primarias presidenciales constituyen "fines públicos", reforzado con la deferencia y respeto que debemos a las actuaciones de la rama legislativa, de igual jerarquía que la judicial, dentro de nuestro sistema de gobierno constitucional, debe merecer nuestro respeto a menos que sea un caso claro de desviación de cualquier propósito público que pueda concebirse.

## III

Comoquiera que uno de los fundamentos decisionales de *P.S.P.* v. *E.L.A.*, supra, fue que "la Asamblea Legislativa está desprovista de poder ... para legislar en zonas reservadas al pueblo de Puerto Rico, tales como la relativa al *voto presidencial*, a menos que el pueblo la autorice expresamente", estimo necesario hacer un breve análisis sobre tal fundamento. (Bastardillas nuestras.)

El Tribunal se refería a la Sec. 19 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico que reza como sigue:

"La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la

Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo."

Para reforzar su afirmación de que la citada cláusula constitucional invade una zona vedada a la autoridad legislativa, cual es la relativa a los derechos pertenecientes al pueblo, descansa el Tribunal en el argumento de que es al Pueblo de Puerto Rico "a quien corresponde entender directamente en la decisión de su destino político final o en la aprobación de medidas que afecten de modo importante sus relaciones con Estados Unidos". Y, se apoya, además, en la Resolución Núm. 23, inciso (d), de la Convención Constituyente, que dice que: "El pueblo de Puerto Rico retiene el derecho de proponer y aceptar modificaciones en los términos de sus relaciones con los Estados Unidos de América."

No cuestiono, mas sin embargo acepto, que cualquier cambio en los *vínculos jurídicos* que rigen la relación del Estado Libre Asociado de Puerto Rico con los Estados Unidos de América, tales como el *voto presidencial,* requiere el consentimiento del pueblo mediante referéndum celebrado al efecto.

La opinión en *P.S.P.* v. *E.L.A.,* supra, que pretende abordar la cuestión constitucional en torno a la reserva de los poderes del pueblo evade el análisis de lo que constituyen las medidas que *afectan* de modo importante las relaciones entre ambos pueblos. Menciona la decisión del destino político final del país y el voto presidencial. Tales decisiones requieren un proceso político complicado y van dirigidas a modificar los *vínculos jurídicos* que unen al Estado Libre Asociado de Puerto Rico con los Estados Unidos de América. Resulta, pues, peregrino que las primarias presidenciales constituyen cambio en dichos *vínculos jurídicos.*

Por los fundamentos expuestos concluyo que tanto la Ley Núm. 6 de 24 de septiembre de 1979 que autoriza las primarias presidenciales, como la Resolución Conjunta Núm. 79 de 12 de julio de 1979, deben sostenerse como constitucionalmente válidas y, en su consecuencia, paralizaría la

orden de entredicho dictada por la Sala de San Juan del Tribunal Superior en 11 de febrero de 1980.

—O—

Voto del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 14 de febrero de 1980

Conscientes de que la decisión de no paralizar los procedimientos torna académico el pretendido derecho a utilizar fondos públicos y demás facilidades gubernamentales en las primarias republicanas del próximo domingo—salvo el uso de las escuelas públicas con sujeción a lo dispuesto en la Ley Núm. 94 de 30 de junio de 1975, 18 L.P.R.A. sec. 126a(a)—y reconociendo la gama de criterios dispares, todos respetables, que esta controversia genera, dentro y fuera del Tribunal, en cuanto a los méritos y curso de acción ulterior del caso, estimamos oportuno exponer varias reflexiones mínimas sobre la inconstitucionalidad del inciso (e) de la Resolución Conjunta Núm. 79 de 12 de julio de 1979, asignando $518,000 para las denominadas Primarias Presidenciales, y de la Ley Núm. 1 de 7 de junio de 1978, 16 L.P.R.A. sec. 3007(n).

I

La sentencia del tribunal de instancia encuentra apoyo en sólidos principios fundamentales, de rango constitucional según consignáramos en nuestra ponencia separada en el caso de *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978). Veamos.

La Ley Núm. 6 de 24 de septiembre de 1979, denominada Ley de Primarias Compulsorias, en términos generales refleja la intención de la Asamblea Legislativa—inspirada en el deseo de darle mayor participación pública a los electores interesados en participar de algún modo en el proceso de selección de candidatos presidenciales de los Estados Unidos. Intenta regular y establece un sistema de primarias presidenciales *obligatorias* en Puerto Rico para canalizar pacíficamente la expresión de los electores puertorriqueños en

cuanto a candidatos a la nominación para la presidencia de los Estados Unidos y para la elección de delegados y sus alternos a la Convención Nacional nominadora de los partidos nacionales. Su exposición de motivos, en síntesis, expresa: que la participación de los puertorriqueños en los procesos preliminares en los Estados Unidos está en consonancia con el preámbulo de nuestra Constitución; ha sido en el pasado limitada; que existe al presente un partido republicano en proceso de reorganización y uno demócrata; que la ciudadanía en general ha expresado un interés en particular; que hay la necesidad imperiosa de reglar y sistematizar, ordenadamente y sin riesgos, dicho proceso; y que para ello será menester asignar fondos públicos caracterizándose la erogación de éstos como uno permisible constitucionalmente. Se hace salvedad sobre los siguientes extremos:

"Es política pública del Pueblo de Puerto Rico la de que corresponde exclusivamente a las mayorías electorales puertorriqueñas el tomar cualquier decisión que estimen propicia con relación al destino político de Puerto Rico mediante su expresión en un proceso plebiscitario que deberá llevarse a cabo separadamente de las Elecciones Generales de Puerto Rico y, por supuesto, separadamente también del proceso de primarias, sean éstas relativas a los partidos políticos locales o a los partidos políticos nacionales.

Por otro lado, consideramos que dado el hecho histórico de la existencia en Puerto Rico de filiales de Partidos Nacionales, es requisito esencial el de que cualquier partido político afiliado, para gozar de tal condición cuente con el reconocimiento del Partido Nacional de que se trate. Esta ley, no obstante liberalizar en cierta medida, los requisitos de inscripción de los partidos políticos afiliados, mantiene las mismas, con el rigor necesario, para asegurar que no se vulnere la buena fe de los Partidos Nacionales. Por ello, se hace mandatorio el que las peticiones de inscripción de los partidos políticos afiliados sean debidamente suscritas ante Notarios Públicos Autorizados."

El Art. Sexto, Sec. 4 de nuestra Constitución reza:

"Las elecciones generales se celebrarán cada cuatro años en el día del mes de noviembre que determine la Asamblea Legislativa.

En dichas elecciones serán elegidos el Gobernador, los miembros de la Asamblea Legislativa y los demás funcionarios cuya elección en esa fecha se disponga por ley.

Será elector toda persona que haya cumplido dieciocho años de edad, y reúna los demás requisitos que se determine por ley. Nadie será privado del derecho al voto por no saber leer o escribir o por no poseer propiedad.

Se dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas.

Todo funcionario de elección popular será elegido por voto directo y se declarará electo aquel candidato para un cargo que obtenga un número mayor de votos que el obtenido por cualquiera de los demás candidatos para el mismo cargo."

Su texto claramente expone—corroborado de un examen detenido del legajo de la Constituyente—que la amplia facultad concedida a la Asamblea Legislativa para promulgar y reglar el proceso electoral se proyecta y parte de la premisa de que dicha facultad es con referencia a elecciones para candidatos a puestos electivos en Puerto Rico. IV *Diario de Sesiones de la Asamblea Constituyente*, 2621 (ed. 1961). Y, claro está, dicho poder no puede usarse indiscriminada o arbitrariamente.

Salta a la vista que la Asamblea Legislativa, mediante la Ley de Primarias antes mencionada, realmente ha creado por ficción unos partidos políticos adicionales que no existen como tal, pues sus miembros necesariamente salen de las filas de los partidos principales locales puertorriqueños. Como veremos más adelante, ello vulnera el derecho de otros electores basado en la igual protección de las leyes.

Como indicáramos en *P.S.P.*, supra:

"El carácter presuntivo de partidos políticos *bona fide*—con aspiraciones legítimas de postular candidatos para las elecciones generales del país—... ha quedado destruido. El nombre no hace la cosa. . . . [Estos partidos] no ostenta[n] ni goza[n] de franquicia electoral en nuestro país lograda mediante el trámite inicial de inscripción exigido en la Ley Electoral a los partidos políticos puertorriqueños. El concepto *partido político afiliado* a uno

nacional, acuñado en la Ley de Primarias Presidenciales Compulsorias, es extraño al bosquejo y diseño constitucional vigente. 'Desde tiempo inmemorial se ha dicho que una *elección para un puesto público* no es nada más ni menos que la expresión por *electores cualificados* de su candidato preferido.' *U.S.* v. *Classic*, 33 U.S. 299, 318 (1940). (Bastardillas nuestras.)

Por circunstancias particulares en la relación política prevaleciente que no nos corresponde examinar, nuestra Constitución ni la de los Estados Unidos reconocen el derecho a que los electores de Puerto Rico voten por los candidatos a dichos cargos públicos. En otras palabras, no somos electores· cualificados para votar con relación a dichos cargos ejecutivos federales. ¿Podría la Asamblea Legislativa otorgar dicha cualidad? Al presente nuestra fuente de poder político y público '. . . emana del pueblo y se ejercerá con arreglo a su voluntad, *dentro de los términos del convenio acordado entre el pueblo de Puerto Rico y los Estados Unidos de América.'* (Art. I, Sec. 1 Constitución.) *R.C.A.* v. *Gobierno de la Capital,* 91 D.P.R. 416 (1964). En lo que respecta al poder de la Legislatura para disponer todo lo concerniente al proceso electoral y ampliar el contenido y atributo de un voto creando cargos electivos, esta autoridad política se extiende solamente a nuestra Isla y aquellas adyacentes dentro de su jurisdicción. Excepto el puesto de Comisionado Residente en Washington, los resultados de unos comicios electorales en el país tienen alcance constitucional y jurídico insular (Art. VI, Sec. 3 Constitución), y no extraterritorial.

El ingrediente medular tutelado en el voto de todo elector—de carácter universal, igual, *directo*, secreto y libre de coacción, según proclamado en la Sec. 2 del Art. II de la Carta de Derechos—y como corolario, el obtener colectivamente una franquicia electoral como medio de garantizar la expresión de la voluntad de un pueblo, presupone que ese voto, en última instancia, será ejercitado y tendrá realmente un valor y eficacia en la elección [directa] de determinados candidatos a puestos públicos. Desprovisto de esa característica, ingrediente, consecuencia y valor, subsiste solamente como expresión privada, sin que le acompañe un efecto político-público fuera de las latitudes, jurisdicción o fronteras en que se desenvuelve el cuerpo político soberano.

·     ·     ·     ·     ·     ·     ·     ·

El diseño constitucional electoral existente en Puerto Rico no lo autoriza. La Asamblea Legislativa no puede por *fiat* extender credenciales ni *status* de partido político a agrupaciones cuyos integrantes no tienen el derecho a votar por unas posiciones

ejecutivas a nivel federal en los Estados Unidos independientemente de la sabiduría o no de dicho fin. Tal actuación carece del elemento consustancial e imprescindible soberano del cual dimana un poder público de esta naturaleza. La Ley Núm. [6] es un mecanismo extra-constitucional negativo de los axiomas antes apuntados.

Estas circunstancias a juicio nuestro despojan el carácter público de la empresa y destruyen la validez y legalidad de la asignación y desembolsos de los [$518,000.00] y el uso de facilidades y personal de la Comisión Estatal de Elecciones en tales elecciones internas.

Es menester aclarar que este pronunciamiento en nada impide al Estado—en el descargo de su obligación de otorgar protección a toda reunión pacífica de cualesquiera ciudadanos ejercitando su derecho a asociación y expresión—que provea la protección necesaria para evitar actos de violencia como los señalados en el historial de la ley."

## II

Según nuestro criterio expresado en la ponencia del caso de *P.S.P.*, supra, tanto la nueva Ley de Primarias, como la asignación de fondos y la participación de la maquinaria gubernamental, violenta la igual protección de las leyes a los electores miembros del Partido Independentista Puertorriqueño y otras personas que se oponen a la celebración de las primarias presidenciales en Puerto Rico.

Tomamos conocimiento judicial de que en la promoción de la actividad para el próximo domingo toda la campaña publicitaria de las primarias republicanas se proyecta sobre la base y el mensaje expreso de que un voto por determinado candidato es un voto para la fórmula de la estadidad. Esta idea también se promueve a través del impreso que lleva la papeleta para elegir delegados, la cual como símbolo ilustra un mapa de la Isla de Puerto Rico conteniendo el número 51:

# PARTIDO REPUBLICANO NACIONAL DE PUERTO RICO

## AGRUPACION DE DELEGADOS REPUBLICANOS PROGRESISTAS

**51**

### Nominación Directa (Write-in)

Se provee este espacio para que el elector anote el nombre de cualquier persona por la que desee votar.
(R-16)

**DELEGADOS EN PROPIEDAD:**

1. Hon. Luis A. Ferré
2. Hon. Hernán Padilla
3. Hon. Oreste Ramos
4. Hon. Freddy Valentín
5. Sra. Julia Rivera De Vicenty
6. Hon. Edwin Ramos Yordán
7. Lcdo. José Menéndez Monroig
8. Sr. Victor M. Gerena
9. Hon. Mickey Miranda
10. Lcdo. Juan A. Palerm
11. Lcdo. Jaime Pieras
12. Lcdo. Rafael Capó
13. Dra. Carmen Pesquera De Busquets
14. Sra. Nitza Navarro

**DELEGADOS ALTERNOS:**

1. Lcdo. Antonio Monroig
2. Lcdo. Mario Gaztambide
3. Sr. José C. Barbosa
4. Lcdo. Raymond Cátala
5. Sr. Orlando Parga, Hijo
6. Lcdo. Celestino Iriarte
7. Lcdo. Jorge Romany
8. Sr. Manny Casiano
9. Hon. Guillermo Campos
10. Srta. Eileen García
11. Prof. Juan Masini Soler
12. Sr. Angel Atienza
13. Orlando Parga, Padre
14. Sr. Jussef M. Galib

MODELO

## PAPELETA DE SELECCION DE DELEGADOS Y DELEGADOS ALTERNOS
### A LA CONVENCION NOMINADORA NACIONAL
### 17 DE FEBRERO DE 1980

"Se manifiesta además al caso de autos en varias dimensiones la violación de la cláusula constitucional de igual protección de las leyes consagrada en las Secs. 1 y 2 de nuestra Carta de Derechos. Veamos. Tomamos conocimiento judicial de que en Puerto Rico existen y se debaten básicamente tres pensamientos ideológicos legítimos en cuanto a su destino político como pueblo: la estadidad, autonomía e independencia. Históricamente estos derroteros han formado parte de la aspiración y expresión individual ciudadana, tomado cuerpo colectivo, y previa inscripción, participado como partidos políticos en los procesos eleccionarios generales. También se ha manifestado en consulta plebiscitaria celebrada a los fines de pulsar la opinión pública en determinada época respecto a una redefinición o modificación de las relaciones básicas entre Puerto Rico y los Estados Unidos. *P.P.D.* v. *Ferré, Gobernador*, 98 D.P.R. 338 (1970).

Diluida propiamente la controversia del caso, la realidad expuesta es un punto de vista válido para invocar una desigualdad de tratamiento. En todos estos procesos, por imperativos de unas garantías constitucionales, la ley siempre ha implementado unos mecanismos igualitarios, particularmente en materia de subsidio económico electoral, proveyendo a todo el electorado del país la opción de poder democráticamente expresar en las urnas su predilección sin que se discrimine contra ninguno de los ideales aludidos. La ejecución de la pieza legislativa que nos ocupa, en lo concerniente al uso de dineros públicos por uno o más grupos de ciudadanos que no ostentan la franquicia electoral, la campaña publicitaria generada por la orientación que la Comisión Estatal de Elecciones debe llevar a cabo, y el hecho de que en su fondo el participar y votar en tales elecciones presupone, proyecta y presenta una vinculación o endoso con los ideales de la estadidad o de asociación autonómica a los Estados Unidos, representa un discrimen y una ventaja—directa e indirecta—de carácter indebido contra aquellos electores independentistas que no coinciden con dichas aspiraciones y otros ciudadanos que propugnan una tesis política contraria. Cualquier otra solución sería un eufemismo judicial y desatendería el único vínculo racional que existe entre la declaración legislativa y el objeto perseguido en la Ley Núm. [6]. ¿Cómo es posible exigir a los electores independentistas que hagan su ingreso y voten en un partido político nacional estadounidense como medio de alcanzar una plataforma que les permita viabilizar sus aspiraciones? No existe un mandato mayoritario, expreso y previo que les obligue, producto de un referéndum o plebiscito—en

que se le haya dado la oportunidad de votar a favor o en contra a todos los electores capacitados del país—sobre la trascendental decisión de incorporar el proceso eleccionario puertorriqueño—financiado y pagado por todos sus contribuyentes—un reconocimiento a los trámites internos y gestiones de los partidos nacionales de los Estados Unidos con miras a lograr alguna participación colectiva en la nominación de candidatos a presidente y vicepresidente. Ello vulnera el principio igualitario que sirve de fundamento y premisa para sostener la legalidad de los desembolsos de unos fondos públicos, que no están asequibles a todos en las urnas en lid electoral en que se miden, en igualdad de condiciones, las alternativas ideológicas o decisiones fundamentales que constituyen un cambio o una redefinición de las relaciones básicas entre Puerto Rico y Estados Unidos, según la Constitución vigente. *P.N.P.* v. *Tribunal Electoral,* [104 D.P.R. 741, 751 (1976)].

Se produce, además, otro discrimen, de carácter dual, contra los electores miembros de partidos políticos principales y por petición puertorriqueños. Primeramente, mientras la Ley Electoral vigente exige a los partidos insulares el que en la elección precedente mantengan o presenten subsiguientemente peticiones de inscripción a base de un cinco por ciento (5%) de fuerza electoral—a los fines de retener u obtener la franquicia—la Ley de Primarias Presidenciales Compulsorias viabiliza la inscripción de un partido político afiliado, grupo de ciudadanos o candidato independiente a base de presentar solamente peticiones de inscripción equivalentes [a la mitad (1/2) del uno por ciento (1%) del total de votos emitidos para el cargo de Gobernador]. En la práctica se están aplicando dos reglas distintas para nominar electores y partidos políticos colocadas bajo la Constitución en una misma posición." *P.S.P.* v. *E.L.A.*, supra, págs. 624–626.

La desigual protección de las leyes se manifiesta vivamente sobre el Partido Independentista Puertorriqueño en virtud del siguiente hecho. Bajo la Ley Electoral vigente dicho partido, como uno principal, es acreedor a un fondo electoral durante el presente año eleccionario ascendente a $200,000.00. 16 L.P.R.A. sec. 3116. Al igual que los otros partidos políticos principales, este dinero puede ser utilizado en sus actividades administrativas de campaña y propaganda política, incluyendo primarias. 16 L.P.R.A. sec. 3118.

Aunque algunos quieran negarlo, el proceso primarista

sobre candidatos a las elecciones presidenciales en los Estados Unidos solamente es compatible con la tesis que acepta y promueve la estadidad o la autonomía. Es irreconciliable con el ideal de la independencia. La creación por la Asamblea Legislativa de la Ley de Primarias y el reconocimiento de agrupaciones locales como afiliadas a los partidos nacionales en Estados Unidos choca contra la tesis política principal del demandante apelado Partido Independentista Puertorriqueño. Para la campaña de orientación por la Comisión Estatal de Elecciones la Asamblea Legislativa proveyó los fondos aquí impugnados, sin embargo, dejó de equiparar, aunque fuera proporcional a los electores de la minoría independentista con fondos públicos para oponerse a la participación en tales primarias. En consecuencia, dicha minoría se ha visto forzada a hacer uso de sus economías provenientes de las aportaciones de sus propios miembros y del fondo electoral. Como corolario, en los próximos comicios electorales del país en noviembre de 1980, la paridad económica visualizada en la Ley Electoral en virtud de fondos públicos ha desaparecido. Los electores de los partidos políticos principales que propulsan la estadidad o autonomía llevan una ventaja pecuniaria sobre la minoría independentista.

Nuestra decisión no queda afectada por el Art. 32 de la Ley:

"Interpretación de los Resultados de las Primarias Presidenciales. Siempre que los procedimientos de primarias presidenciales sean administrados e implementados desde su inicio hasta cumplimentación final por el Administrador Estatal de Elecciones, ni el número de los participantes, ni los resultados de ningún otro elemento del proceso de las mismas y/o demás procedimientos que se lleven a tenor con lo dispuesto en esta ley podrá ser oficialmente interpretado por el Gobierno de Puerto Rico para propósito alguno como indicador en relación con las preferencias que tenga o pueda tener nuestro pueblo o un sector del mismo en cuanto al asunto del status político, ni en cuanto a la dirección, si alguna, por la cual deba o pueda encaminarse Puerto Rico en términos de cambios a su actual status."

La campaña publicitaria y de propaganda partidista que generan las primarias y la forma en que la han vinculado a la estadidad una mayoría de los candidatos presidenciales, anula el texto de ley antes transcrito. La norma de hermenéutica legislativa choca contra la realidad viva; es una utopía la abstracción del proceso.