PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO, representado por su Presidente, RUBÉN BERRÍOS MARTÍNEZ, demandante y apelado, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, GERINELDO BARRETO PÉREZ, ETC., JULIO CÉSAR PÉREZ, ETC., demandados y apelantes; NEW DEMOCRATIC PARTY OF PUERTO RICO, interventor y apelante, LUIS A. FERRÉ, HERNÁN PADILLA, ORESTE RAMOS, HIJO, y EDWIN RAMOS YORDÁN como funcionarios del PARTIDO REPUBLICANO LOCAL, interventores y apelantes.

*Número:* O-80-68        *Resuelto:* 27 de febrero de 1980

*Héctor A. Colón Cruz, Procurador General,* y *Justo Gorbea Varona, Subprocurador General Interino,* abogados de los apelantes Estado Libre Asociado y Secretario de Hacienda; *Miguel A. Pagán, Eunice Sein Llompart* y *José A. Carlo,* abogados del Administrador General de Elecciones, apelante; *Héctor M. Laffitte* y *Héctor Reichard, Jr.,* abogados del New Democratic Party of Puerto Rico, interventor; *Quetglas, Subirá, Gaztambide,* abogados de Luis A. Ferré y otros, como funcionarios del Partido Republicano Local, interventores y apelantes; *Luis Rivera Lacourt,* abogado del Partido Independentista Puertorriqueño, apelado.

### SENTENCIA

Visto el Art. V, Sec. 4 de la Constitución del Estado Libre Asociado que dispone que ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el Tribunal y por estar igualmente dividido, se revoca la sentencia dictada por el tribunal

de instancia que declaró inconstitucional el inciso (e) de la Resolución Conjunta Núm. 79 de 12 de julio de 1979.

Así lo pronunció y manda el Tribunal y certifica el señor Secretario. El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rigau confirmarían la sentencia apelada y se reservan el derecho a expresar sus criterios por escrito; el Juez Asociado Señor Dávila revocaría la sentencia apelada y emitió opinión a la cual se unen los Jueces Asociados Señores Martín, Díaz Cruz e Irizarry Yunqué; el Juez Asociado Señor Martín emitió una opinión particular; el Juez Asociado Señor Díaz Cruz emitió un opinión particular a la que se une el Juez Asociado Señor Irizarry Yunqué; el Juez Asociado Señor Negrón García emitió una opinión disidente en la que confirmaría la sentencia apelada y a la cual se une el Juez Asociado Señor Torres Rigual. Los jueces se reservan el derecho a expresarse posteriormente.

(Fdo.) Ernesto L. Chiesa

*Secretario General*

—O—

Opinión del Juez Asociado Señor Dávila a la cual se unen los Jueces Asociados Señores Martín, Díaz Cruz e Irizarry Yunqué.

San Juan, Puerto Rico, a 27 de febrero de 1980

El Partido Independentista Puertorriqueño solicitó del Tribunal Superior, Sala de San Juan, que se dictara un interdicto dirigido al Administrador General de Elecciones y al Secretario de Hacienda prohibiéndole el uso de propiedades y fondos públicos, así como la intervención del Administrador General de Elecciones, en la promoción, administración, dirección y celebración de las primarias presidenciales a celebrarse de acuerdo con lo establecido en la Ley Núm. 6 de 24 de septiembre de 1979. En la demanda radicada alega:

"4. Que dicha utilización de fondos públicos para tales propósitos es ilegal e inconstitucional por los siguientes fundamentos:

a) Es ilegal porque la Resolución Conjunta Número 79 de 12 de julio de 1979 dispone lo siguiente:

'Sección 1. . . . (e) Gastos relacionados con las Primarias Presidenciales, *de acuerdo con las disposiciones de la Ley Número 102 de 24 de junio de 1977* . . . $518,000.00' [Énfasis en el original.]

La Ley Número 102 de 24 de junio de 1977 fue derogada por el Artículo 35 de la Ley Número 6 de 24 de septiembre de 1979. Dicha Ley Número 6, ni ley alguna, ha dispuesto la transferencia de fondos para la implementación del estatuto en vigor que es la referida Ley Núm. 6. En otras palabras, se han estado usando fondos asignados para la instrumentación de un estatuto derogado, en violación de la Sección 9, Artículo 6 de la Constitución de Puerto Rico que prohíbe el uso de fondos públicos sin autoridad de ley.

b) Es inconstitucional porque ni el Partido Demócrata, ni el Republicano de Estados Unidos, son partidos políticos puertorriqueños, según se definen en la Ley Electoral de Puerto Rico, ni son los que 'dentro de las normas fijadas por nuestra legislación electoral colaboran en la vital tarea de elegir periódicamente el gobierno del país' por lo que el uso de fondos públicos para sufragar gastos en Puerto Rico de esos partidos norteamericanos viola la Sección 9 del Artículo VI de la Constitución de Puerto Rico.

c) Porque el auspicio, con cargo al erario público, de actividades políticas de partidos norteamericanos en Puerto Rico constituye un movimiento dirigido al adelanto de la asociación o unión permanente de Puerto Rico con los Estados Unidos de Norteamérica, lo cual entraña un cambio de status político de Puerto Rico, asunto en que 'la Constitución del Estado Libre Asociado quiso diseñar un esquema que dejase libre a todo ciudadano para propulsar y defender sus propias ideas sobre el destino final de Puerto Rico; no puede invocarse esa Constitución como apoyo para paso alguno que incline o aparente inclinar la balanza hacia determinado tipo de status. Además, 'la Asamblea Legislativa está desprovista de poder, sin embargo, para legislar en zonas reservadas al Pueblo de Puerto Rico, tales como la relativa al voto presidencial, a menos que el pueblo lo autorice expresamente', según la jurisprudencia.

5. Que las actuaciones ilegales de los demandados violan los

derechos civiles de los demandantes bajo la Constitución de Puerto Rico."

Al dictar sentencia concediendo el remedio solicitado el tribunal de instancia decretó lo siguiente:

"a) Se declara inconstitucional la Resolución Conjunta Núm. 79 del 12 de julio de 1979 por infringir la sección 9 del artículo VI y la sección 19 del artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.

b) Se expide interdicto permanente en contra de los demandados Gerineldo Barreto Pérez, en su carácter de Administrador General de Elecciones de Puerto Rico, y Julio César Pérez, en su carácter de Secretario de Hacienda de Puerto Rico, y se les prohíbe el uso de propiedades y fondos públicos y la intervención de la Comisión Estatal de Elecciones, del Administrador General de Elecciones y de todo otro funcionario o empleado del Estado Libre Asociado de Puerto Rico en la promoción, administración, dirección y celebración de las referidas primarias presidenciales."

La sentencia recurrida está basada fundamentalmente en lo resuelto por este Tribunal en *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978). Esto es, el tribunal sentenciador acoge los fundamentos aducidos por la parte demandante en los incisos (b) y (c) del apartado 4 de la demanda que arriba transcribimos. No hace pronunciamiento alguno en cuanto al inciso (a).

Para una ordenada disposición del recurso, procede disponer en primer término el fundamento de impugnación que no consideró el tribunal de instancia.

Sostener que la Resolución Conjunta Núm. 79 de 12 de julio de 1979, inciso (e), se ha tornado inválida con la aprobación de la Ley Núm. 6 de 24 de septiembre de 1979, implica una violación a los más elementales principios de la interpretación de estatutos. Aparte de que el propio Código Civil señala que el medio más eficaz y universal para descubrir el verdadero sentido de una ley es considerar la razón y espíritu de ella (Art. 19), nuestra jurisprudencia ha rechazado una interpretación literal de un estatuto que conduce a un resultado que no puede haber sido el que intentó el legislador. *Pueblo* v. *Seda*, 82 D.P.R. 719, 725 (1961).

También hemos dicho que "la ley debe interpretarse tomando en consideración los fines que persigue y en forma tal que la interpretación se ajuste al fundamento racional o fin esencial de la ley y a la política pública que la inspira." *Esso Standard Oil* v. *A.P.R.R.*, 95 D.P.R. 772, 785 (1968). Más aún, hemos sostenido que es nuestra obligación "evitar interpretar un estatuto en forma tal que lleve a un resultado irrazonable." *Colonos de Santa Juana* v. *Junta Azucarera*, 77 D.P.R. 392, 396 (1954); *M. Mercado e Hijos* v. *Junta Azucarera*, 95 D.P.R. 852, 859 (1968). Nuestra obligación es, en el caso que nos ocupa, interpretar la Resolución Conjunta Núm. 79 en términos de que su inciso (e) se refiere a gastos relacionados con las Primarias Presidenciales de acuerdo con las disposiciones de la ley que regula dichas primarias. En el momento en que se aprueba la resolución, dicha ley era la Núm. 102 de 24 de junio de 1977; por eso se mencionó expresamente en el texto. Hoy, la ley correspondiente es la Ley Núm. 6 de 24 de septiembre de 1979. La aprobación de esa ley enmendó tácitamente el texto de la referida resolución para que la referencia sea a la Ley Núm. 6 de 24 de septiembre de 1979. Aun el sentido común se pronuncia a favor de ello. Ya hemos dicho que "no hay regla de hermenéutica legal que impida a los jueces utilizar el sentido común al interpretar las leyes". *Álvarez & Pascual, Inc.* v. *Srio. Hacienda*, 84 D.P.R. 482, 491 (1962). Aquí la regla de hermenéutica y el sentido común coinciden.

La Asamblea Legislativa al aprobar la nueva ley de primarias—Ley Núm. 6 de 24 de septiembre de 1979—actuó acorde con los pronunciamientos de este Tribunal en *P.S.P.* v. *E.L.A.*, supra. El fundamento principal de aquel dictamen fue al efecto de que:

"Es al pueblo de Puerto Rico, por tanto, a quien corresponde entender directamente en la decisión de su destino político final o en la aprobación de medidas que afecten de modo importante sus relaciones con Estados Unidos. La Asamblea Legislativa del país tiene facultad para disponer plebiscitos no discriminatorios sobre tales medidas o sobre la cuestión general del *status*. La asignación

de fondos para tales fines constituye indudablemente una asignación de fondos para fines públicos. La Asamblea Legislativa está desprovista de poder, sin embargo, para legislar en zonas reservadas al pueblo de Puerto Rico, tales como la relativa al voto presidencial, a menos que el pueblo la autorice expresamente. Una asignación de fondos para fines no autorizados no solamente infringe la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, sino también la Sec. 19 del Art. II, relativa a los derechos pertenecientes al pueblo. La asignación de fondos efectuada por la Res. Núm. 17 de 30 de junio de 1978 invade una zona vedada a la autoridad legislativa."

Esta expresión fue inspirada por la interpretación que este Tribunal le dio a la actividad que se intentaba llevar a cabo por la parte demandada y que motivó la radicación del pleito por el Partido Socialista Puertorriqueño. Entendía el Tribunal que la celebración de primarias para escoger los dirigentes locales de un partido nacional podía interpretarse como un paso a favor de determinado status político.

La Asamblea Legislativa al aprobar la nueva ley de primarias consignó en el Art. 32 que "[s]iempre que los procedimientos de primarias presidenciales sean administrados e implementados desde su inicio hasta cumplimentación final por el Administrador Estatal de Elecciones, ni el número de los participantes, ni los resultados de ningún otro elemento del proceso de las mismas y/o demás procedimientos que se lleven a tenor con lo dispuesto en esta ley podrá ser oficialmente interpretado por el Gobierno de Puerto Rico para propósito alguno como indicador en relación con las preferencias que tenga o pueda tener nuestro pueblo o un sector del mismo en cuanto al asunto del status político, ni en cuanto a la'dirección, si alguna, por la cual deba o pueda encaminarse Puerto Rico en términos de cambios a su actual status".

La propaganda que puedan hacer los partidos políticos al efecto de que la celebración de primarias significa la aprobación por el pueblo de Puerto Rico de determinada solución al status político, no puede alterar en forma alguna la intención

legislativa enmarcada en el Art. 32 antes transcrito. Las leyes se enmiendan por otras leyes, no por las expresiones de los líderes políticos fuera del ámbito legislativo.

La asignación de fondos públicos para la celebración de las primarias presidenciales no contraviene lo dispuesto en la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico. Ciertamente es un fin público canalizar la expresión de los votantes puertorriqueños para la selección de los delegados que participan en las convenciones a celebrarse por los partidos políticos nacionales para seleccionar los dos candidatos a la primera magistratura de la nación americana, de suerte que no puede impugnarse como fraudulento el proceso mediante el cual se seleccionan. Esa es la voluntad expresada por la mayoría de los funcionarios electos por el público y que participan en la aprobación de una pieza legislativa. En un gobierno democrático organizado fundamentalmente para implementar la voluntad del pueblo, que es su fuente de poder, la expresión de esa voluntad debe ser propiciada y facilitada para que puedan las acciones de la administración mantener armonía y correspondencia con el criterio del pueblo mandante.

Se adelanta que la celebración de las primarias presidenciales vulnera la cláusula de la Constitución de los Estados Unidos que garantiza que "ningún estado . . . negará a nadie, dentro de su jurisdicción la igual protección de las leyes". Enmienda XIV.

Es principio básico aceptado por la jurisprudencia y los tratadistas que los tribunales no considerarán la validez constitucional de una medida legislativa a menos que sea expresa y directamente planteada la cuestión. *E.L.A.* v. *Aguayo*, 80 D.P.R. 552 (1958); *Singleton* v. *Wulff*, 428 U.S. 106 (1976).

En *Walker* v. *Tribl. Contribuciones y Tesorero*, 72 D.P.R. 698–706 (1951), consignamos "que tales cuestiones [constitucionales] deben ser resueltas en primera instancia por un tribunal inferior luego de determinar todos los hechos en que

puede basar su decisión y no meramente a base de admisiones hechas por las partes al plantear cuestiones de derecho".

En el presente caso hemos visto lo expresado en la demanda radicada transcrito anteriormente. En su alegato ante este Tribunal el demandante apelado expresa que la acción ejercitada "se basó en tres fundamentos a saber:

a) Que la referida Ley Núm. 6 no tiene fondos asignados y que los demandados estaban utilizando para su instrumentación fondos destinados a la Ley Núm. 102 de 24 de junio de 1977, la cual había sido derogada por el Art. 35 de dicha Ley Núm. 6.

b) Que ni el Partido Demócrata, ni el Partido Republicano de Estados Unidos son partidos políticos puertorriqueños de acuerdo con la Ley Electoral de Puerto Rico por lo que el uso de fondos públicos para sufragar sus gastos en Puerto Rico viola la sección 9 del Art. VI de la Constitución de Puerto Rico.

c) Que el auspicio, con cargo al erario público, de actividades políticas de partidos norteamericanos en Puerto Rico constituye un movimiento dirigido al adelanto de la asociación o unión permanente de Puerto Rico con los Estados Unidos de Norteamérica, la cual entraña un cambio del status político de Puerto Rico, facultad para cuyo cambio está reservada al pueblo de Puerto Rico y no a la Asamblea Legislativa."

No ataca la validez constitucional de la medida legislativa por el fundamento de que vulnera la cláusula de la igual protección de las leyes. Ni lo hizo en instancia ni lo plantea en apelación. Ya hemos visto que el tribunal de instancia al dictar sentencia no lo incluye como fundamento para decretar la invalidez de la medida impugnada. Adviértase, además, que el contenido y rigor de la fundamental cláusula requiere para su aplicación unas determinaciones que no constan en el caso de autos y que hacerlas en apelación resultarían especulativas. L. H. Tribe, *American Constitutional Law*, Mineola, N.Y., 1978, pág. 991 *et seq.*

Independientemente de que no se planteara en las alegaciones de la parte demandante apelada ni fuera el fundamento en que se basó la sentencia del tribunal de instancia, tengo serias dudas sobre la validez del argumento de inconstitucionalidad basado en la cláusula de igual protección. El

propósito principal de la Ley de Primarias Presidenciales Compulsorias, Núm. 6 de 24 de septiembre de 1979, no es subvencionar partidos ni agrupaciones políticas. Dicho propósito fue claramente expresado en la Exposición de Motivos de dicha ley: "proveer un sistema racional y seguro que viabilice" la participación de los puertorriqueños que lo deseen en las primarias de los partidos políticos de Estados Unidos a que estén afiliados. No puede pasarse por alto que esa participación envolvió en las primarias del Partido Demócrata celebradas en octubre de 1978 a más de 350,000 electores.

El Estado tiene el deber de proteger el orden y de garantizar a los ciudadanos su derecho a ejercitar las prerrogativas democráticas. El hecho de que determinado partido o agrupación entienda que no debe participar no es óbice para que se proteja a los que participan y se disponga de fondos públicos para viabilizar esa protección.

Procede la revocación de la sentencia apelada.

—O—

Opinión particular del Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 27 de febrero de 1980

Me he unido a la opinión del compañero Juez Dávila por entender que sostiene el criterio que expresé en 14 de febrero de 1980 al oponerme a la resolución de este Tribunal que, por los fundamentos expresados en *P.S.P.* v. *E.L.A.*, [1] se negó a detener el interdicto permanente dictado por el Tribunal Superior al declarar inconstitucional el inciso (e) de la Resolución Conjunta Núm. 79 de 12 de julio de 1979. Entiendo que la doctrina sentada en *P.S.P.*, supra, queda hoy sin efecto.

—O—

Opinión particular del Juez Asociado Señor Díaz Cruz a la que se une el Juez Asociado Señor Irizarry Yunqué.

----

[1] 107 D.P.R. 590 (1978).

San Juan, Puerto Rico, a 27 de febrero de 1980

Al resolver en *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978), que era impropia la utilización de personal y fondos públicos en la administración de una elección interna del *New Democratic Party of Puerto Rico* nos confrontamos con hechos que han sido desplazados por la realidad vital que posteriormente ha tomado cuerpo impulsada por nuevos desarrollos: en la elección interna del Partido Demócrata se informó la participación de 370,000 votantes; en la primaria del Partido Republicano de los Estados Unidos celebrada el 17 febrero, 1980 se dio al público el dato de unos 210,000 electores votantes; la primaria propuesta para el 16 de marzo próximo no se ciñe como aquella primera, a la estrechez de un cambio de estructuras administrativas para gobierno interno del partido, y sí es consulta preferencial a los votantes sobre candidatos a la Presidencia de los Estados Unidos y medio de selección de delegados a la convención donde se decidirá la candidatura presidencial. Ha desaparecido el adicional fundamento de la decisión predicado en el carácter plebiscitario de aquella primera elección al vedar la citada Ley Núm. 6 de 1979 en su Art. 32 el uso o reclamo del resultado de la elección en la promoción de determinado status político para Puerto Rico.

En el sistema de gobierno democrático, la comunicación entre el pueblo y la administración debe ser continua. El gobierno debe estar receptivo e informado de las ideas y criterios del pueblo respecto a los asuntos trascendentes que mueven su expresión y voluntad. Los representados que constituyen la base y fuente de poder deben ser escuchados por sus gobernantes. Cuando el asunto de interés se esparce entre parte considerable del pueblo, la consulta, el referéndum, la elección especial son los instrumentos adecuados para conocer esa voluntad. De escuchar esa expresión y de conocer sus dimensiones se trata en este caso y son los organismos electorales del Estado el medio más confiable de captación del sentir del pueblo. La consulta directa al

electorado revive la autenticidad del mandato en la democracia original. La participación masiva de puertorriqueños en estas elecciones le ha dado irrecusable credencial de asunto de interés público sobre el cual la gente está deseosa de que se oiga y se perciba su opinión. Declara nuestra Constitución que el poder político del Estado Libre Asociado de Puerto Rico emana del pueblo y se ejercerá con arreglo a su voluntad, dentro de los términos del convenio acordado entre el pueblo de Puerto Rico y los Estados Unidos de América. (Art. I, Sec. 1.) Y que las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. (Art. II, Sec. 2.)

No considero que la ley impugnada sufra endeblez constitucional por negar igual protección a partidos minoritarios. La ley no ofrece fondos de campaña, simplemente pone los servicios del Administrador General de Elecciones y la garantía y formalidad de un proceso oficial a la disposición de los partidos que deseen participar. Si no asigna fondos a los que participan, ¿qué desigualdad hay en no asignarlos a los que no participan? El retraimiento en cualquier elección es táctica a ser acordada cuando la aconsejen los mejores intereses del partido, pero no vemos razón para que el Estado subvencione la abstención que justificada o no en determinadas circunstancias por conveniencias partidistas, no pierde su figura de anomalía del proceso electoral.

Un sector respetable del pueblo ha manifestado su deseo de que se oiga y se tome en cuenta su criterio respecto a su intervención, aun cuando incompleta, en la selección del Presidente de la nación cuya ciudadanía es factor determinante en nuestra vida. (Constitución, Preámbulo.) Al tomar conocimiento judicial de que el pueblo quiere ser oído, de que existe una firme y robusta decisión de ciudadanos americanos residentes en Puerto Rico de que se atienda a su ejercicio democrático de expresión de voluntad, estimo que esa expresión debe ser propiciada en la forma ordenada por la Ley de

Primarias Presidenciales Compulsorias (Núm. 6 de 24 sept., 1979) y percibo un diáfano fin público en rodear este ejercicio de participación directa por el pueblo en los asuntos políticos que le preocupan, de los óptimos auspicios de seguridad, autenticidad y limpieza que pueden proveer los fondos y los organismos del Estado en la administración y supervisión de la primaria presidencial. La Constitución nunca es barrera para contener la expresión del pueblo sino instrumento de su realización.

Revocaría la sentencia recurrida.

—O—

Opinión disidente del Juez Asociado Señor Negrón García a la cual se une el Juez Asociado Señor Torres Rigual.

San Juan, Puerto Rico, a 27 de febrero de 1980

Se inspira este disenso en los fundamentos expuestos expresamente en la sentencia del tribunal de instancia que detectó una "violación de la cláusula constitucional de la igual protección de las leyes . . ." y concluyó, que "igualmente la nueva ley de primarias perpetúa [. . . un] discrimen . . ." contra el demandante apelado Partido Independentista Puertorriqueño (P.I.P.).

Al así hacerlo, confesamos que como curso de acción ulterior ponderamos la opción del silencio frente al de la expresión escrita, reconociendo lo volátil de la situación debido a que los planteamientos de derecho presentados en el caso surgían de un trasfondo fáctico eminentemente político-partidista. Ello quizás con mayor justificación, en causas impopulares como la presente—en que se reclama la legitimidad de la acción gubernamental sobre la débil base de un endoso previo de un segmento mayoritario del país—y naufragan más fácilmente los derechos de las minorías.

Comprendíamos pues, que aquellos que desconocen o intentan socavar los valores éticos que impregnan la función judicial, podrían interpretar los pronunciamientos jurídicos

plasmados en esta ponencia en apoyo del decreto de inconstitucionalidad—lo mismo que cualesquiera posiciones de otros jueces—como representativos y expositivos de unas preferencias personales, y no el resultado de un proceso sereno e imparcial de conciencia judicial sobre la esencial igualdad en la reglamentación de voto de *todos* los electores puertorriqueños. Contra tal apreciación, producto de la ignorancia o de un juicio informado—*bona fide*, o malicioso—la única escapatoria del jurista sería abstenerse o ceder el ejercicio de su jurisdicción invocando cualquier pretexto de los múltiples que existen—a veces contradictorios—en la jurisprudencia y textos de derecho constitucional. Rechazamos ambas alternativas. ([1])

Por lo demás, "reconocemos las discusiones intelectuales, jurídicas y políticas—serias, histéricas y apasionadas—que generan controversias de esta índole. Como Tribunal colegiado nuestros fallos no están inmunes a la crítica, sea constructiva, sana, injusta o viciosa". ([2])

Esta apelación impugna la sentencia del Tribunal Superior que—luego de reconocer correctamente la capacidad del Partido Independentista Puertorriqueño (P.I.P.) para demandar, asumir apropiadamente jurisdicción, y aplicar los pronunciamientos pertinentes del caso de *P.S.P.* v. *E.L.A.*, supra—declaró inconstitucional el inciso (e) de la Resolución Conjunta

---

([1]) Tanto en el *pasado*, presente y razonablemente en el futuro, es de esperarse crítica de todo género. Dependiendo del color del cristal utilizado, nuestras opiniones se caracterizan como equivocadas o correctas, especulativas o pragmáticas, conservadoras o liberales, pro o antiobreras, comunistas o demócratas y de otros modos. A manera de ejemplo, se dice que el Poder Judicial puertorriqueño, como "rama institucional tiene en nuestra particular situación político-constitucional [. . . la tarea] de ser uno de los instrumentos de conformación de la dependencia colonial . . . , funcionando a base de la ideología de la clase colonialista políticamente dominante. Es decir, que la institución del Poder Judicial de Puerto Rico, como una parte del aparato del Estado, está al servicio de la dominación norteamericana . . .". Delgado Cintrón, *Cuestiones de Ideología del Poder Judicial en Puerto Rico*, XLVII Rev. Jur. U.P.R. 107–108 (1978).

([2]) Salvo aclaración en contrario, los textos reproducidos corresponden a nuestra *opinión separada* emitida en *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978).

Núm. 79 del 12 de julio de 1979 (³) asignando $518,000.00 para cubrir y sufragar los gastos relacionados con la implementación de la Ley Núm. 6 de 24 de septiembre de 1979—denominada Ley de Primarias Presidenciales Compulsorias—por alegadamente infringir la Sec. 9 del Art. VI y la Sec. 19 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico. Conjuntamente con dicho decreto expidió interdicto permanente en contra de los demandados apelantes, el Administrador General de Elecciones Gerineldo Barreto Pérez y Julio César Pérez, Secretario de Hacienda, prohibiéndoles el uso de propiedades y fondos públicos y la intervención de la Comisión Estatal de Elecciones, del Administrador General de Elecciones y de todo otro funcionario o empleado del Estado Libre Asociado de Puerto Rico en la promoción, administración, dirección y celebración de las primarias presidenciales de los días 17 de febrero (Partido Republicano Nacional de Puerto Rico) y 16 de marzo de 1980 (*New Democratic Party*).

En alzada, el *New Democratic Party* (N.D.P.) solicitó intervención, vista oral y que dejáramos provisionalmente sin efecto el interdicto. Los interventores Luis A. Ferré, Hernán Padilla, Oreste Ramos, hijo, y Edwin Ramos Yordán, como funcionarios del Partido Republicano Local, afiliado al Nacional Republicano, apelaron. Permitimos la intervención de N.D.P. y concedimos oportunamente vista. Negamos la paralización de los procedimientos.

Sobre este último extremo, es de rigor apuntar que todo auxilio de jurisdicción precisa de una evaluación jurídica preliminar, sin que inexonerablemente prejuzgúe el desenlace final del caso. La situación es análoga al ejercicio de nuestra función discrecional apelativa expidiendo determinado auto de revisión o *certiorari*.

---

(³) La sala sentenciadora no cualificó ni limitó su pronunciamiento al inciso (e). Sobre este particular todas las partes estuvieron de acuerdo en que la sentencia debería estimarse enmendada.

El auxilio de jurisdicción del *New Democratic Party*
solicitando dejáramos sin efecto temporalmente el entredicho
se apoyaba en el argumento de que "ninguna ley se declarará
inconstitucional a no ser por una mayoría del número total de
los jueces que esté compuesto el Tribunal de acuerdo con esta
Constitución o con la Ley". Art. V, Sec. 4. En otras palabras,
implícitamente se entendía que el Tribunal Superior, Sala de
San Juan, no tenía autoridad en ley para dictaminar la
inconstitucionalidad de la parte pertinente de la Resolución
Conjunta asignando fondos. El supuesto es erróneo. Los
tribunales de instancia, en casos apropiados, poseen la facul-
tad y obligación de emitir tales fallos. El requisito y limitación
sobre mayoría absoluta se aplica únicamente al Tribunal
Supremo en su mecánica de votación como foro colegiado. No
priva a los foros de instancia de sus poderes judiciales.
3 *Diario de Sesiones de la Asamblea Constituyente*, 1639–
1641 (ed. 1961). En consecuencia, este Tribunal al pasar
juicio sobre los méritos del auxilio de jurisdicción lo hizo
sobre una disposición legal, que en ese momento, no gozaba de
"presunción de constitucionalidad" por haber sido despojada
de dicho atributo en virtud de la mencionada sentencia. No
estábamos confirmando en dicha etapa su inconstitucionali-
dad, aunque es de notar que una mayoría absoluta estuvo
conforme en negar la paralización de los procedimientos. ([4])
El empate de votos que hoy se produce y la ausencia de una
mayoría absoluta, tiene el efecto de reintegrarle la carac-
terística de constitucionalidad a dicha asignación de fondos,
aunque señalamos que este resultado no es en virtud de un
proceso evaluativo de sus méritos intrínsecos, sino por razón
de la regla constitucional que exige mayoría absoluta.

## I

La comparecencia escrita y oral de las partes y el análisis y
reflexión ulterior, nos convence que la sentencia apelada debe

---

([4]) Excepto los Jueces Asociados Señores Dávila y Martín quienes disintieron.

subsistir por sostenerse en sólidos principios fundamentales, de rango constitucional, según consignáramos en nuestra ponencia separada en *P.S.P.*, supra, y aquellos adicionales aquí expuestos.

Para visualizar las ramificaciones profundas sobre la aplicabilidad al caso de autos de la cláusula de igual protección de las leyes, es menester entender que, distinto a los estados de la Unión Norteamericana, no existe el derecho a votar por el Presidente de los Estados Unidos y el proceso electoral y político en Puerto Rico presenta unas variantes únicas debido a su peculiar condición política-constitucional y el debate continuo de su destino final. Como consecuencia, para aquel que desconoce esta realidad, resulta difícil aceptar y comprender cómo ciertos fenómenos y movimientos de la política partidista norteamericana, independientemente de su sabiduría o atractivo, no pueden constitucional y válidamente trasplantarse automáticamente al país sin garantizar los distintos sectores de opinión.

También ayuda a apreciar nuestro análisis, saber qué son unas primarias. De la definición de la Ley Electoral se colige que es el procedimiento mediante el cual los electores de los partidos políticos nominan sus candidatos a cargos públicos electivos. (Art. 1.003 (37).) Es pues, un asunto eminentemente político en el cual los miembros de determinado partido expresan su preferencia. En este sentido, unas primarias sustituyen los caucus, peticiones o convenciones nominativas como medio de nominar candidatos. En los Estados Unidos aproximadamente casi la mitad de los estados se rigen por una ley de primarias. Los restantes por el mecanismo de caucus o convenciones de partidos.

Como evento que involucra un segmento sustancial de la población, todo proceso de primaria genera una campaña publicitaria, directa e indirecta, remunerada y gratuita. El atractivo de los nombres y símbolos adoptados, las posiciones de los candidatos y los intercambios de ideas, encuentran cabida, expresión y eco en la prensa radial, escrita y televisada

del país. La audiencia electoral aumenta. Las primarias, en su fase preparatoria y eleccionaria, producen entusiasmo entre los seguidores de los distintos candidatos y partidos políticos. Constituyen un medio efectivo de propaganda para mantener activa la agrupación política, y vivas las controversias de importancia. En ese sentido los estudiosos reconocen que toda primaria representa un vehículo positivo de proselitismo político para partidos y candidatos ganar adeptos a sus causas.

La Ley Núm. 6 de 24 de septiembre de 1979, denominada Ley de Primarias Presidenciales Compulsorias, en términos generales, refleja la intención de la Asamblea Legislativa, inspirada en el deseo de darle mayor participación pública a los electores interesados en participar de algún modo, en el proceso de nominación y selección de candidatos presidenciales de los Estados Unidos. Intenta regular y establece un sistema de primarias presidenciales *obligatorias* en Puerto Rico para canalizar pacíficamente la expresión de los electores puertorriqueños de los Estados Unidos y para la elección de delegados y sus alternos a la Convención Nacional nominadora de los partidos nacionales. Aun cuando no exista nada más que un candidato, por ser compulsorias, hay que celebrar tales primarias. Su Exposición de Motivos, en síntesis expresa: que la participación de los puertorriqueños en los procesos preliminares en los Estados Unidos está en consonancia con el preámbulo de nuestra Constitución; ha sido en el pasado limitada; que existe al presente un partido republicano en proceso de reorganización y uno demócrata; que la ciudadanía en general ha expresado un interés en particular; que hay la necesidad imperiosa de reglar y sistematizar, ordenadamente y sin riesgos dicho proceso; y que para ello será menester asignar fondos públicos caracterizándose la erogación de éstos como uno permisible constitucionalmente. Hace salvedad sobre lo siguiente:

"Es política pública del Pueblo de Puerto Rico la de que corresponde exclusivamente a las mayorías electorales puertorri-

queñas el tomar cualquier decisión que estimen propicia con relación al destino político de Puerto Rico mediante su expresión en un proceso plebiscitario que deberá llevarse a cabo separadamente de las Elecciones Generales de Puerto Rico y, por supuesto, separadamente también del proceso de primarias, sean éstas relativas a los partidos políticos locales o a los partidos políticos nacionales.

Por otro lado, consideramos que dado el hecho histórico de la existencia en Puerto Rico de filiales de Partidos Nacionales, es requisito esencial el de que cualquier partido político afiliado, para gozar de tal condición cuente con el reconocimiento del Partido Nacional de que se trate. Esta ley, no obstante liberalizar en cierta medida, los requisitos de inscripción de los partidos políticos afiliados, mantiene las mismas, con el rigor necesario, para asegurar que no se vulnere la buena fe de los Partidos Nacionales. Por ello, se hace mandatorio el que las peticiones de inscripción de los partidos políticos afiliados sean debidamente suscritas ante Notarios Públicos Autorizados."

Los apelantes aducen que la ley de primarias es válida por haber sido aprobada en virtud del poder legislativo para prescribir lo concerniente a las elecciones según el Art. VI, Sec. 4 de nuestra Constitución, que reza:

"Las elecciones generales se celebrarán cada cuatro años en el día del mes de noviembre que determine la Asamblea Legislativa. En dichas elecciones serán elegidos el Gobernador, los miembros de la Asamblea Legislativa y los demás funcionarios cuya elección en esa fecha se disponga por ley.

Será elector toda persona que haya cumplido dieciocho años de edad, y reúna los demás requisitos que se determine por ley. Nadie será privado del derecho al voto por no saber leer o escribir o por no poseer propiedad.

Se dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas.

Todo funcionario de elección popular será elegido por voto directo y se declarará electo aquel candidato para un cargo que obtenga un número mayor de votos que el obtenido por cualquiera de los demás candidatos para el mismo cargo."

Discrepamos. Si bien el texto transcrito—corroborado de un examen detenido del legajo de la Constituyente—confiere

amplia facultad a la Asamblea Legislativa para promulgar y reglar el proceso electoral, esta autoridad se concede bajo la premisa de que será ejercitada con referencia a elecciones ⸱ para candidatos a puestos electivos en Puerto Rico. IV *Diario de Sesiones de la Asamblea Constituyente*, 2621 (ed. 1961).

Y claro está, dicho poder no puede usarse indiscriminada o arbitrariamente. Como veremos más adelante, la Asamblea Legislativa, mediante la Ley de Primarias Compulsorias ante nos, realmente ha creado por ficción unos partidos adicionales que no existen como tal, pues sus miembros necesariamente salen de las filas de los partidos principales locales puertorriqueños. Anticipamos que ello vulnera el derecho de otros electores basado en la igual protección de las leyes.

Según indicáramos en *P.S.P.*, supra:

"El carácter presuntivo de partidos políticos *bona fide*—con aspiraciones legítimas de postular candidatos para las elecciones generales del país—... ha quedado destruido. El nombre no hace la cosa.... [Estos partidos]... no ostenta[n] ni goza[n] de franquicia electoral en nuestro país lograda mediante el trámite inicial de inscripción *exigido* en la Ley Electoral a los partidos políticos puertorriqueños. El concepto *partido político afiliado* a uno nacional, acuñado en la Ley de Primarias Presidenciales Compulsorias, es extraño al bosquejo y diseño constitucional vigente. 'Desde tiempo inmemorial se ha dicho que una *elección para un puesto público* no es nada más ni menos que la expresión *por electores cualificados* de su candidato preferido.' *U.S.* v. *Classic*, 313 U.S. 299, 318 (1940). (Bastardillas nuestras.)

Por circunstancias particulares en la relación política prevaleciente, que no nos corresponde examinar, nuestra Constitución ni la de los Estados Unidos reconocen el derecho a que los electores de Puerto Rico voten por los candidatos a dichos cargos públicos. En otras palabras, no somos electores cualificados para votar con relación a dichos cargos ejecutivos federales. ¿Podría la Asamblea Legislativa otorgar dicha cualidad? Al presente nuestra fuente de poder político y público '... emana del pueblo y se ejercerá con arreglo a su voluntad, *dentro de los términos del convenio acordado entre el pueblo de Puerto Rico y los Estados Unidos de América.*' (Art. I, Sec. 1 Constitución.) *R.C.A.* v. *Gobierno de la Capital*, 91

D.P.R. 416 (1964). En lo que respecta al poder de la Legislatura para disponer todo lo concerniente al proceso electoral y ampliar el contenido y atributo de un voto creando cargos electivos, esta autoridad política se extiende solamente a nuestra Isla y aquellas adyacentes dentro de su jurisdicción. Excepto el puesto de Comisionado Residente en Washington, los resultados de unos comicios electorales en el país tienen alcance constitucional y jurídico insular (Art. VI, Sec. 3, Constitución) y no extraterritorial.

El ingrediente medular tutelado en el voto de todo elector—de carácter universal, igual, *directo,* secreto y libre de coacción, según proclamado en la Sec. 2 del Art. II de la Carta de Derechos—y como corolario, el obtener colectivamente una franquicia electoral como medio de garantizar la expresión de la voluntad de un pueblo, presupone que ese voto, en última instancia, será ejercitado y tendrá realmente un valor y eficacia en la elección [directa] de determinados candidatos a puestos públicos. Desprovisto de esa característica, ingrediente, consecuencia y valor, subsiste solamente como expresión privada, sin que le acompañe un efecto político-público fuera de las latitudes, jurisdicción o fronteras en que se desenvuelve el cuerpo político soberano. (Bastardillas nuestras.)

.        .        .        .        .        .        .        .

El diseño constitucional electoral existente en Puerto Rico no lo autoriza. La Asamblea Legislativa no puede por *fiat* extender credenciales ni *status* de partido político a agrupaciones cuyos integrantes no tienen el derecho a votar por unas posiciones ejecutivas a nivel federal en los Estados Unidos independientemente de la sabiduría o no de dicho fin. Tal actuación carece del elemento consustancial e imprescindible soberano del cual dimana un poder público de esta naturaleza. La Ley Núm. [6] es un mecanismo extra constitucional negativo de los axiomas antes apuntados.

Estas circunstancias a juicio nuestro despojan el carácter público de la empresa y destruyen la validez y legalidad de la asignación y desembolsos de los [$518,000.00] y el uso de facilidades y personal de la Comisión Estatal de Elecciones en tales elecciones. . . .

Es menester aclarar que este pronunciamiento en nada impide al Estado—en el descargo de su obligación de otorgar protección a toda reunión pacífica de cualesquiera ciudadanos ejercitando su derecho a asociación y expresión—que provea la protección necesaria para evitar actos de violencia como los señalados en el historial de la ley."

## II

En apoyo de la constitucionalidad de la asignación de los fondos públicos, el *New Democratic Party* (N.D.P.) y otros interventores argumentan los extremos que a continuación examinamos.

Primeramente sostiene el N.D.P. que "es una asociación voluntaria de ciudadanos con el propósito *de promover ideas de naturaleza política*, económicas y sociales", y que en este sentido "no difiere en absoluto de ninguno de los partidos principales de Puerto Rico". Estamos de acuerdo en la naturaleza colectiva y voluntaria de N.D.P. Sin embargo, hasta ahí llega esta comparación, más bien de índole conceptual, con los demás partidos políticos puertorriqueños. *No* está inscrito conforme a la Ley Electoral vigente con propósitos de participar en las elecciones generales del país ni colabora en la selección local y general de funcionarios a puestos públicos en Puerto Rico. Sí colabora, de manera indirecta y sujeta a múltiples contingencias, en la selección de uno de los posibles candidatos a nominaciones para la Presidencia de los Estados Unidos por determinado partido nacional.

En segundo lugar, nos apunta que el "restringir que se usen fondos asignados por la Resolución Conjunta Núm. 79 para la divulgación del proceso primarista, emascula el *derecho de asociación, porque la divulgación es parte esencial de una efectiva asociación y organización de los miembros del N.D.P.*" (Alegato, pág. 6.) Confesamos que no alcanzamos a ver en qué forma es que se violenta el derecho de asociación y organización. Nadie les prohíbe asociarse, organizarse y divulgar sus ideas. Además, el argumento se contradice con lo expuesto posteriormente por el N.D.P. en el sentido de que "[d]e manera que para solicitar votar o abstenerse de votar en las primarias, no se requiere ninguna asignación del gobierno para partido alguno". (Alegato, pág. 9.)

Se nos dice que la cláusula de igual protección de las leyes no ampara al sector independentista, pues *"conforme al*

*plebiscito de 1967, la tesis independentista fue rechazada y el pueblo seleccionó la unión permanente.* De manera que las primarias están fuertemente apoyadas en la voluntad soberana del pueblo". (Alegato, pág. 9.) La contención es errónea. No toma en cuenta que en ningún momento dicha consulta plebiscitaria giró sobre la participación y votación en los procesos de primarias presidenciales de los partidos nacionales, que según reconocido, intenta como última consecuencia, tener algún efecto en la elección del presidente de los Estados Unidos. La aseveración del interventor sólo puede comprenderse si se acepta la hipótesis, a nuestro entender errónea, de que el voto presidencial fue expresamente autorizado en el año 1967. Además, el que las primarias sean compatibles con la estadidad federada o la autonomía, no faculta a la Asamblea Legislativa a promulgar leyes discriminatorias contra los electores independentistas. Bajo el razonamiento que se nos ofrece, se tiende a dar la impresión de que el referido plebiscito de 1967—en que resultó vencedora la fórmula del Estado Libre Asociado—perpetuó dicho status, y por ende no puede someterse al electorado una nueva consulta en torno a posibles cambios, parciales o totales, en la relación política, incluyendo la estadidad federada o independencia.

Por último, dirigimos nuestra atención al señalamiento de que "[l]a Ley de Primarias no impide que el P.I.P. se afilie a cualquier otro partido nacional que apoye la independencia para Puerto Rico. En Estados Unidos existen otros partidos nacionales en adición a los partidos Demócrata y Republicano. El Tribunal puede tomar conocimiento de las incursiones del Partido Independentista solicitando cooperación de congresistas que apoyan la independencia para Puerto Rico. (5) En suma, en nada se afecta el P.I.P. con la celebración de las

(5) Aunque negamos validez constitucional para ello, bajo este razonamiento, y aquel en que se predica parte de esta ley—según su Exposición de Motivos—en el sentido de que "existe en el votante un legítimo interés de seleccionar libremente las personas que habrán de representarle en la confección del programa de gobierno de

primarias presidenciales ni con la asignación de fondos para costear la celebración y programación de las mismas".

El argumento peca de ingenuidad y es especulativo. Ciertamente es irrazonable pedirle al sector independentista que se involucre, participe y vote en las primarias por determinado candidato a la presidencia de los Estados Unidos como medio de expresión legítima electoral de lograr sus propósitos. Debe recordarse que, esencialmente, el ejercicio de un elector de su preferencia presidencial en las primarias, bajo esta ley, no es otra cosa que el votar en una consulta de quien a su juicio, en última instancia, debe ser seleccionado para presidente. Es un voto que permanece en el umbral del proceso. Desde este prisma podemos concluir que todo proceso primarista que intenta reglar el ejercicio de un voto sobre puestos públicos en los cuales los electores no pueden constitucionalmente votar, es uno fallido, que según veremos, goza más bien de la característica de consulta o referéndum, para lo cual es menester proveer unas garantías especiales a los opositores. Puede exigirse responsabilidad, consecuencias y acatamiento a los resultados de los procesos eleccionarios del país, referéndums o plebiscitos cuando éstos no son discriminatorios y se han caracterizado por condiciones de razonable igualdad no presentes en la ley que nos ocupa. (Arts. 7.006, 7.007 y 7.008 de la Ley Electoral.) [6]

---

cada Partido Nacional", podría incualificadamente la Legislatura extender la participación e involucrar al electorado de Puerto Rico en el proceso de primarias que seleccionan a los candidatos al Congreso, que a manera de ejemplo, se han mostrado favorables a las necesidades del pueblo de Puerto Rico o representan unos segmentos sustanciales de compatriotas que residen en New York u otras partes del continente.

[6] Sección 3306. Participación de partidos políticos, agrupación de ciudadanos y personas individuales

"En todo referéndum o plebiscito, cualquier partido político, agrupación de ciudadanos o persona individual, podrá defender o atacar cualesquiera de las alternativas a votarse en el mismo y para dichos fines podrá realizar cualquier actividad política, de persuasión o propaganda, que sea lícita y sujeto ello a las limitaciones provistas en este Subtítulo."

Sección 3307: Notificación de participación

"Los partidos políticos podrán participar en los referéndums o plebiscitos,

## III

Reafirmamos la opinión de que tanto la nueva Ley como la asignación de fondos y la participación de la maquinaria gubernamental, violenta la igual protección de las leyes a los electores miembros del Partido Independentista Puertorriqueño y otras personas que se oponen a la celebración de las primarias presidenciales en Puerto Rico.

La Sec. 6, Art. IX de las disposiciones transitorias de la Constitución reza:

"Los partidos políticos continuarán disfrutando de todos los derechos que les reconozca la ley electoral, siempre que reúnan los requisitos mínimos exigidos para la inscripción de nuevos partidos políticos por la ley vigente al comenzar a regir esta Constitución. La Asamblea Legislativa, cinco años después de estar en vigor la Constitución, podrá cambiar estos requisitos, *pero cualquier ley que aumente los mismos, no será efectiva hasta después de celebrada la elección general siguiente o la aprobación de la misma.*" (Bastardillas nuestras.)

Esta disposición trasciende su carácter temporal para dar cabida permanente al axioma rector que impregna la Carta de Derechos de la Constitución de que en una sociedad democrática todos los electores y partidos políticos "gozarán de iguales derechos". *Diario de Sesiones, op. cit.,* 2067. A través de las Secs. 1 y 2 de la Carta (⁷) persiste e impone a la Asamblea

---

siempre que sus organismos directivos centrales informen a la Comisión Electoral de tal intención dentro de los treinta (30) días siguientes a la fecha de vigencia de la ley autorizando la celebración del plebiscito o referéndum en cuestión.

"Igualmente, podrán participar cualesquiera agrupaciones de ciudadanos que estén a favor o en contra de la proposición a decidirse en tal votación siempre que cumplan con los requisitos que a tales efectos disponga la ley habilitadora de la misma."

Sección 3308. Financiamiento

"En todo referéndum o plebiscito que ordene la Asamblea Legislativa, ésta proveerá los mecanismos de financiamiento del mismo y determinará las cantidades de dinero, si alguna, que se autorizarán y concederán a los partidos políticos y agrupaciones de ciudadanos para su campaña."

(⁷) Ambas secciones realzan la dignidad e igualdad del ser humano, prohíben discrímenes políticos y prescriben que las leyes garantizarán el sufragio y la franquicia electoral.

Legislativa unas limitaciones al ejercicio de su amplia facultad para reglamentar la formación de los partidos políticos, negándole poder para poner en vigor, durante el cuatrienio en que aprueba la pieza legislativa, cambios que aumenten los requisitos de inscripción. Cualesquiera de tales modificaciones sólo pueden tener vigencia pasadas las elecciones generales ulteriores.

En el contexto constitucional expuesto, el principio igualitario intenta evitar que en determinada época, un partido mayoritario—que controle las Ramas Legislativa y Ejecutiva—se perpetúe en el poder limitando la génesis de otros partidos, y, además: (a) agrave la situación de los partidos de oposición existentes; y (b) introduzca cambios de cualesquiera forma en las leyes y reglas que rigen la contienda electoral en beneficio y ventaja del partido gubernamental y en perjuicio de los otros. Esta prohibición respecto a aumentar esos requisitos, es susceptible de manifestarse y aplicarse a toda situación que tienda a hacer onerosa y afectar negativa y sustancialmente las potencialidades de los partidos contrarios minoritarios. En palabras sencillas, no pueden cambiarse las reglas de juego durante su desarrollo para lograr ventajas.

¿Qué tangencia y efectos tienen estos principios constitucionales sobre la Ley de Primarias Presidenciales Compulsorias?

Hemos dicho que mediante dicha ley, la Asamblea Legislativa "realmente ha creado por ficción unos partidos políticos *adicionales* que *no existen* como tal, pues sus miembros necesariamente salen de las filas de los partidos principales locales puertorriqueños". (Énfasis nuestro.) Adicionalmente, hemos sostenido que el "proceso primarista sobre candidatos a las elecciones presidenciales en los Estados Unidos . . . promueve la estadidad o la autonomía [y que] [e]s irreconciliable con el ideal de la independencia". Voto del Juez Asociado Señor Negrón García en *P.I.P.* v. *E.L.A.*, 109 D.P.R. 335, 347, 352–53 (1980). Estas expresiones y su impacto jurídico-constitucional ameritan cierta elaboración.

Al momento de aprobarse, tanto la primera Ley de Pri-

marias presidenciales compulsorias, como la actual—Núm. 102 de 24 de junio de 1977 y Núm. 6 de 24 de septiembre de 1979, respectivamente—en el panorama político ·puertorriqueño existían tres partidos principales, a saber, el mayoritario Partido Nuevo Progresista (P.N.P.), propulsor del ideal de la estadidad federada; Partido Popular Democrático, promotor de la autonomía; y el demandante apelado, Partido Independentista Puertorriqueño (P.I.P.), impulsor del ideal de la independencia. Con igual derrotero, pero en proceso de inscripción, estaba el Partido Socialista Puertorriqueño (P.S.P.).

Por circunstancias que no nos compete evaluar, la realidad aceptada es que para la inscripción, elecciones internas, y sobre todo, para las primarias exigidas por la ley, la mayoría de los delegados y delegados alternos del interventor Partido Republicano Nacional de Puerto Rico que aparecen en la papeleta modelo ilustrada en esta ponencia son miembros prominentes de la Asamblea Legislativa o funcionarios públicos del presente, o pasado inmediato, que representan o están vinculados con el P.N.P., partido político mayoritario que domina la Legislatura y el Poder Ejecutivo. (⁸)

Tomamos conocimiento judicial de que en la promoción de la actividad del pasado domingo 17 de enero de 1980 toda la campaña publicitaria de las primarias republicanas se proyectó sobre la base y el mensaje expreso de que un voto por determinado candidato era un voto para la fórmula de la estadidad. A la simple participación, se le adjudicó y atribuye igual propósito. Esta idea también se promueve en los anuncios del Centro de Información de la Comisión Estatal de

---

(⁸) *Delegados en Propiedad:* Hon. Luis A. Ferré; Hon. Hernán Padilla; Hon. Oreste Ramos; Hon. Freddy Valentín; Sra. Julia Rivera de Vincenti; Hon. Edwin Ramos Yordán; Lic. José Menéndez Monroig; Sr. Víctor M. Gerena; Hon. Mickey Miranda; Lic. Jaime Pieras; Hon. Juan A. Palerm; Lic. Rafael Capó; Sra. Carmen Pesquera de Busquets y Sra. Nitza Navarro. *Delegados Alternos:* Lic. Antonio Monroig; Lic. Mario Gaztambide; Sr. José C. Barbosa; Lic. Raymond Cátala; Sr. Orlando Parga, hijo; Lic. Celestino Iriarte; Lic. Jorge Romany; Sr. Manny Casiano; Hon. Guillermo Campos; Srta. Eileen García; Profesor Juan Masini Soler; Sr. Angel Atienza; Orlando Paya, padre; y Jussef M. Galib.

Elecciones, publicado en los rotativos del país *con* fondos públicos—hasta que medió el interdicto que nos ocupa—a través del impreso que lleva la papeleta para elegir delegados, la cual, como símbolo, ilustra un mapa de la Isla de Puerto Rico conteniendo el número 51: (⁹)

## PARTIDO REPUBLICANO NACIONAL DE PUERTO RICO

**AGRUPACION DE DELEGADOS REPUBLICANOS PROGRESISTAS**

51

**Nominación Directa (Write-in)**

Se provee este espacio para que el elector anote el nombre de cualquier persona por la que desee votar.
(R-16)

**DELEGADOS EN PROPIEDAD:**

1. Hon. Luis A Ferré
2. Hon. Hernán Padilla
3. Hon. Oreste Ramos
4. Hon. Freddy Valentín
5. Sra. Julia Rivera De Vicenty
6. Hon. Edwin Ramos Yordán
7. Lcdo. José Menéndez Monroig
8. Sr. Víctor M. Gerena
9. Hon. Mickey Miranda
10. Lcdo. Juan A. Palerm
11. Lcdo. Jaime Pieras
12. Lcdo Rafael Capó
13. Dra Carmen Pesquera De Busquets
14 Sra Nitza Navarro

**DELEGADOS ALTERNOS.**

1. Lcdo Antonio Monroig
2. Lcdo. Mario Gaztambide
3. Sr. José C. Barbosa
4. Lcdo. Raymond Cátala
5. Sr. Orlando Parga, Hijo
6. Lcdo. Celestino Iriarte
7. Lcdo. Jorge Romany
8. Sr. Manny Casiano
9. Hon Guillermo Campos
10. Srta. Eileen García
11. Prof. Juan Masini Soler
12. Sr. Angel Atienza
13. Orlando Parga, Padre
14. Sr. Jussef M. Galib

MODELO

**PAPELETA DE SELECCION DE DELEGADOS Y DELEGADOS ALTERNOS A LA CONVENCION NOMINADORA NACIONAL 17 DE FEBRERO DE 1980**

(⁹) Sobre el valor de los símbolos y nombres, véase nuestra ponencia concurrente y disidente en *Democratic Party* v. *Tribunal Electoral,* 107 D.P.R. 1 (1978).

En este aspecto, es interesante notar cómo esta similitud e identidad de personas se extiende, sutilmente, a los nombres seleccionados por ambas agrupaciones. *New Democratic Party,* traducido al vernáculo es *"Partido Nuevo* Demócrata", y Partido Republicano Nacional de Puerto Rico aparece dirigido por la Agrupación de Delegados Republicanos *Progresistas.*

La campaña de orientación, la participación y pronunciamientos públicos de estos líderes, junto con la comparecencia, propaganda y endosos de los candidatos principales norteamericanos y delegados en propiedad y alternos que figuran en dicha papeleta, destaca el hecho incuestionable de que la jerarquía y directiva en ambos partidos (P.N.P.) y Partido Republicano Nacional de Puerto Rico es una misma.

De igual modo ocurre en la jerarquía del *New Democratic Party* guardando semejanza innegable con los líderes del P.N.P., y en menor grado con el P.P.D. ([10]) Esta similitud obviamente se extiende en cuanto a los electores miembros de los partidos políticos afiliados—Republicano Nacional de Puerto Rico y *New Democratic Party*. Estos partidos forzosamente se sostienen de los electores que pertenecen o sienten simpatías por el P.N.P. o el P.P.D. Por su manifiesta incompatibilidad, no podemos decir que se vigoriza con electores independentistas. En otras palabras, los partidos políticos afiliados están siendo controlados y dirigidos, y además necesaria y sustancialmente se están manteniendo, por los dirigentes y los electores miembros del partido que ostenta las riendas del gobierno y controla la mayoría en la

---

([10]) "[D]istinguidas personalidades puertorriqueñas han comprometido sus esfuerzos en las causas que representa este partido, que tiene sus propios rasgos y perfiles en la política puertorriqueña. Entre ellos se encuentran: Doña Felisa Rincón de Gautier; Celeste Benítez; Rafael Hernández Colón; Angel Viera Martínez; Baltasar Corrada del Río, y muchísimos otros más que sería prolijo enumerar." (Alegato N.D.P., pág. 5.)

Al presente, según certificación: "Presidente (en licencia solicitada y concedida por Comité Ejecutivo), Franklyn Delano López; Vice-Presidenta (Presidenta Interina), Angeles Mendoza Tió; 'National Committee Man', Baltasar Corrada del Río; 'National Committee Woman', Nívea Hernández de McClintock; Vice-Presidente Ejecutivo, Angel Viera Martínez; Secretaria Ejecutiva, Marlene Ibern de Gillette; Director de Finanzas, Eugenio Portilla; Tesorero, Ernesto Valdés; Comisionado Electoral, Peter Kryzanowski; *Coordinadores:* San Juan, José Granados Navedo; Bayamón, Luis Nazario, Ramón Luis Rivera; Arecibo, Calixto Calero Juarbe, Antonio Reyes Santiago; Mayagüez-Aguadilla, Israel Roldán González, José Clemente González; Ponce, Frank Rodríguez García, Félix Ramón Estevez; Guayama, Jaime Soldevila, Claudio Rodríguez; Humacao, Víctor Contreras, Ana Millán; Carolina, Jorge Navarro Alicea. *Miembros por Acumulación:* Pedro Vázquez, Virgilio Ramos González, Juan J. Mayol, Miguel Hernández, Mercedes Torres, Buenaventura Esteves, Charles Lafont. *Asesor Legal:* Angel Ramírez."

Asamblea Legislativa y ejerce el Poder Ejecutivo (P.N.P.), y limitadamente por aquel que propugna la autonomía (P.P.D.).

Esta radiografía de la estructura y miembros de los partidos políticos afiliados nos obliga a concluir que son unos álter ego, por así decirlo, de los dos partidos políticos principales, únicos que ejercen y tienen representación en las cámaras legislativas. Aunque en la ley no se le atribuye dicho propósito, la mayoría de los candidatos presidenciales por el Partido Republicano Nacional de Puerto Rico y sus líderes, al igual que algunos de los dirigentes del *New Democratic Party*, han reclamado y reiterado que la participación en ambas primarias es un paso hacia la estadidad federada. Determinamos que los denominados partidos políticos afiliados constituyen, más bien, unos instrumentos de proselitismo político de los dos partidos mayoritarios P.N.P. y P.P.D., cuyos propósitos logran a través de las primarias.

Para un observador imparcial, los efectos negativos de los principios constitucionales antes esbozados comienzan a perfilarse.

En primer lugar, la implementación de la Ley de Primarias Presidenciales Compulsorias, con la simple y oportuna radicación de solamente un medio por ciento (1/2%) de peticiones de inscripción—en contraste con el requisito del cinco por ciento (5%) exigido a los electores bajo la Ley Electoral—no sólo reduce sino que viabiliza, *con ventajas*, la inscripción de unos partidos políticos afiliados a los partidos nacionales Republicano y Demócrata. Ello implica, que de la noche a la mañana, por decreto legislativo, se crea o confiere categoría de partidos políticos—aunque con fines limitados a las consultas primarias presidenciales—a dos partidos pro estadistas o autonomistas, que sin necesidad de participar en las elecciones generales, reciben y son acreedores a todos los beneficios económicos y de propaganda partidista, directos e indirectos, que según hemos visto, todo proceso primarista conlleva.

En segundo término, para llevar a cabo los eventos

primaristas de dichos partidos afiliados, no sólo se proveen fondos públicos, sino que la ley, al ponerse en vigor amplía los límites de contribuciones económicas que las personas natu- rales y jurídicas pueden hacer en Puerto Rico para fines de política partidista. Ello significa un aumento en la capacidad de recolecta económica de los partidos políticos principales locales que los controlan, P.N.P. y P.P.D., sobre el P.I.P. pues, la ley de primarias permite contribuciones económicas para tales partidos políticos afiliados *en adición* a las aportaciones autorizadas en el Art. 3005 del Título III de la Ley Electoral. (Art. 29 de la Ley de Primarias.) Es un hecho aceptado "ante los adelantos técnicos de comunicación rápida, directa y masiva, [que] el libre intercambio y la fluidez de ideas y la discusión en torno a los asuntos públicos y las cualificaciones de los candidatos, dependen en gran medida de la capacidad económica de éstos y los partidos políticos." *P.N.P.* v. *Tribunal Electoral,* 104 D.P.R. 741, 750 (1976).

Frente al P.I.P., como partido independentista y sus miembros, aparecen dos partidos adicionales cuya razón de ser es contraria a sus fundamentos. Ante las exigencias en la Ley Electoral de un cinco por ciento (5%) en peticiones de inscripción para reconocer otro partido, también de orienta- ción independentista, el P.S.P., la Asamblea Legislativa permite dos partidos políticos contrarios con el fácil y mínimo requisito de medio por ciento (1/2%).

Bajo la perspectiva de estricta neutralidad judicial, es evidente que la Asamblea Legislativa, no sólo de jure, sino de facto, con la participación activa de sus miembros políticos principales, ha cambiado sustancialmente las reglas elec- torales vigentes en detrimento del partido demandante y de los independentistas del país. Reafirmamos que este trata- miento, por sí solo, es contrario a nuestra Constitución y suficiente para sostener el decreto de la sala sentenciadora.

También se manifiesta, aunque no de manera taxativa sino implícitamente y por operación, en las circunstancias particulares antes expuestas, que la Ley de Primarias Presi-

denciales Compulsorias establece unas clasificaciones fundadas en ideas políticas, pues divide aquellos electores que desean participar frente a los que se oponen. Nuestra Carta de Derechos prohíbe todo discrimen por razón de "ideas políticas"—Art. II, Sec. 1—y eleva esta protección a un alto pedestal entre los múltiples valores heredados y tomados de la Constitución de los Estados Unidos.

En *Zachry International* v. *Tribunal Superior,* 104 D.P.R. 267, 277–278 (1975), expresamos que las normas sobre igual protección:

"[N]o exigen un trato igual para todos los ciudadanos, pero prohíben un trato desigual injustificado. El Estado puede hacer clasificaciones entre las personas sin infringir dicho principio siempre y cuando la clasificación sea razonable y con miras a la consecución o protección de un interés público legítimo. El problema consiste en dictaminar cuando la clasificación es razonable o no.

Para analizar la clasificación, se han elaborado, básicamente, dos criterios: el primero, conocido frecuentemente como análisis tradicional (*'traditional' equal protection analysis*), dispone que una clasificación legislativa no debe ser invalidada a menos que sea claramente arbitraria y no pueda establecerse nexo racional alguno entre la misma y un interés legítimo del Estado. Bajo esta fórmula, se ha interpretado que es constitucional una ley siempre que pueda concebirse razonablemente una situación de hechos que justifique la clasificación.

Evidentemente, este criterio o medida (*standard*) coloca el peso de la prueba en aquel que alega la inconstitucionalidad de la legislación en controversia.

El segundo criterio, de génesis más reciente y como reacción a la insatisfactoria generada por el primero, establece que cuando la clasificación afecta derechos fundamentales del ciudadano o va dirigida contra una clasificación sospechosa, la misma estará sujeta a un estricto escrutinio judicial. En este caso, corresponde al Estado demostrar la existencia de un interés público apremiante o de superior jerarquía (*compelling state interest*) que justifique la clasificación y que la misma promueva necesariamente la consecución de ese interés. Este criterio ha sido aplicado a ciertas leyes que establecen distinciones sospechosas, como las basadas en la raza, nacionalidad, ciudadanía, pobreza o nacimiento."

No es necesario mucho esfuerzo mental para concluir que

distinciones por razón de "ideas políticas" son clasificaciones inherentemente sospechosas, y por ende, sujetas a una rigurosa revisión judicial.

## IV

Tampoco se ha establecido un interés apremiante que en el balance de derechos en conflicto, las convalide. Nada impide que la Asamblea Legislativa supere los aspectos operacionales discriminatorios de esta ley proveyendo las garantías igualitarias necesarias.

Las primarias presidenciales intentan delinear y financiar una mecánica *compulsoria* para que los electores puertorriqueños que lo desean, a través de unos denominados partidos políticos afiliados a los nacionales, expresen su preferencia sobre quienes deben ser *nominados* para el cargo de Primer Ejecutivo Federal. La expresión es una inicial e inconclusa. Goza más bien de carácter consultivo, pues: (a) no es para un cargo público electivo sobre el cual los puertorriqueños puedan ejercitar el voto directo, cualidad requerida en la Constitución; y (b) en el N.D.P. los candidatos no vienen compelidos a votar por el candidato que ha recibido la preferencia mayoritaria de los electores. Ello, unido a su obligatoriedad—que significa que hay que celebrarlas aun cuando sólo haya un candidato lo cual contrasta inexplicablemente con el enfoque que prevalece para las primarias de los partidos políticos insulares, Art. 4.006, Código Electoral— la asemejan a un referéndum o plebiscito cuya característica principal precisamente es la de consultar al electorado para la "aprobación o rechazo de uno o varios asuntos de interés general". ([11]) Art. 1.005(39).

---

([11]) En nuestra ponencia separada en *P.S.P.*, admitimos que las primarias generan interés público y que es un asunto que reclama la atención de un número sustancial de ciudadanos. Negarlo sería un absurdo, pues son un atractivo para los miles de electores que militan en los partidos principales antes mencionados. Sin embargo, rechazamos la lógica que con cierta tardanza ahora descubre, el concepto de interés público y lo reduce a unos términos cuantitativos. Bajo este razonamiento, ¿por qué si se conocía previamente la participación de 370,000 votantes en las

Este carácter de referéndum o consulta, queda evidenciado al notar que la legislación no toma en cuenta el requisito constitucional imprescindible que tiene que poseer todo voto, a saber, que sea *igual*. Esta característica llanamente, significa que sólo se puede emitir uno por cada elector. A menos que se interprete que la prohibición y penalidades dispuestas en el Art. 8.026 del Código Electoral, (¹²) sobre doble votación, son aplicables cuando unas primarias se celebran en fechas distintas—en virtud del lenguaje del Art. 31 de la Ley de Primarias Presidenciales Compulsorias—es factible que un elector vote en ambos eventos sin otra sanción, de origen puertorriqueña, que el repudio moral.

Argüir que este requisito no aplica al proceso primarista porque no se trata de una elección a puestos públicos en Puerto Rico, es precisamente admitir que la Asamblea Legislativa no está realmente tutelando el voto válido del elector puertorriqueño dentro de los parámetros constitucionales permisibles. Además, otra vez aplica dos normas distintas: una para los votos de los electores de los partidos políticos puertorriqueños y otro para los llamados partidos *afiliados* a los nacionales.

## V

Recapitulando, como dijimos en *P.S.P.*, supra:

"Se manifiesta además al caso de autos en varias dimensiones la violación de la cláusula constitucional de igual protección de las leyes consagrada en las Secs. 1 y 2 de nuestra Carta de Derechos. Veamos. Tomamos conocimiento judicial de que en Puerto Rico existen y se debaten básicamente tres pensamientos ideológicos

---

elecciones internas del *New Democratic Party,* no se aceptó el argumento como bueno para las primarias del Partido Republicano Nacional de Puerto Rico?

El carácter de referéndum o plebiscito de las primarias presidenciales queda diáfanamente establecido en las expresiones contenidas a la página 2, del voto particular emitido por dos magistrados de este foro en apoyo de su constitucionalidad.

(¹²) "Toda persona que sin derecho a votar lograre hacerlo o que, *aún teniendo derecho a votar, lo hiciere más de una vez,* incurrirá en delito grave y convicta que fuere será sancionada con penas de reclusión por un término mínimo de un (1) año y máximo de tres (3) años." (Bastardillas nuestras.)

legítimos en cuanto a su destino político como pueblo: la estadidad, autonomía e independencia. Históricamente estos derroteros han formado parte de la aspiración y expresión individual ciudadana, tomado cuerpo colectivo, y previa inscripción, participado como partidos políticos en los procesos eleccionarios generales. También se ha manifestado en consulta plebiscitaria celebrada a los fines de pulsar la opinión pública en determinada época respecto a una redefinición o modificación de las relaciones básicas entre Puerto Rico y los Estados Unidos. *P.P.D.* v. *Ferré, Gobernador*, 98 D.P.R. 338 (1970).

Diluida propiamente la controversia del caso, la realidad expuesta es un punto de vista válido para invocar una desigualdad de tratamiento. En todos estos procesos, por imperativos de unas garantías constitucionales, la ley siempre ha implementado unos mecanismos igualitarios, particularmente en materia de subsidio económico electoral, proveyendo a todo el electorado del país la opción de poder democráticamente expresar en las urnas su predilección sin que se discrimine contra ninguno de los ideales aludidos. La ejecución de la pieza legislativa que nos ocupa, en lo concerniente al uso de dineros públicos por uno o más grupos de ciudadanos que no ostentan la franquicia electoral, la campaña publicitaria generada por la orientación que la Comisión Estatal de Elecciones debe llevar a cabo, y el hecho de que en su fondo el participar y votar en tales elecciones presupone, proyecta y presenta una vinculación o endoso con los ideales de la estadidad o de asociación autonómica a los Estados Unidos, representa un discrimen y una ventaja—directa e indirecta—de carácter indebido contra aquellos electores independentistas que no coinciden con dichas aspiraciones y otros ciudadanos que propugnan una tesis política contraria. Cualquier otra solución sería un eufemismo judicial y desatendería el único vínculo racional que existe entre la declaración legislativa y el objeto perseguido en la Ley Núm. [6]. ¿Cómo es posible exigir a los electores independentistas que hagan su ingreso y voten en un partido político nacional estadounidense como medio de alcanzar una plataforma que les permita viabilizar sus aspiraciones? No existe un mandato mayoritario, expreso y previo que les obligue, producto de un referéndum o plebiscito—en que se le haya dado la oportunidad de votar a favor o en contra a todos los electores capacitados del país—sobre la trascendental decisión de incorporar el proceso eleccionario puertorriqueño—financiado y pagado por todos sus contribuyentes—un reconocimiento a los trámites internos y gestiones de los partidos nacionales

de los Estados Unidos con miras a lograr alguna participación colectiva en la nominación de candidatos a presidente y vicepresidente. Ello vulnera el principio igualitario que sirve de fundamento y premisa para sostener la legalidad de los desembolsos de unos fondos públicos, que no están asequibles a todos en las urnas en lid electoral en que se miden, en igualdad de condiciones, las alternativas ideológicas o decisiones fundamentales que constituyen un cambio o una redefinición de las relaciones básicas entre Puerto Rico y Estados Unidos, según la Constitución vigente. *P.N.P.* v. *Tribunal Electoral* [104 D.P.R. 741, 751 (1976)].

Se produce, además, otro discrimen, de carácter dual, contra los electores miembros de partidos políticos principales y por petición puertorriqueños. Primeramente, mientras la Ley Electoral vigente exige a los partidos insulares el que en la elección precedente mantengan o presenten subsiguientemente peticiones de inscripción a base de un cinco por ciento (5%) de fuerza electoral—a los fines de retener u obtener la franquicia—la Ley de Primarias Presidenciales Compulsorias viabiliza la inscripción de un partido político afiliado, grupo de ciudadanos o candidato independiente, a base de presentar solamente peticiones de inscripción equivalentes [. . . a la mitad (1/2) del uno por ciento (1%) del total de votos emitidos para el cargo de Gobernador]. En la práctica se están aplicando dos reglas distintas para nominar electores y partidos políticos colocadas bajo la Constitución en una misma posición."

Para terminar, la desigual protección de las leyes se manifiesta además vivamente sobre el Partido Independentista Puertorriqueño en virtud del siguiente hecho. Bajo la Ley Electoral vigente dicho partido, como uno principal, es acreedor a un fondo electoral durante el presente año eleccionario ascendente a $200,000.00. 16 L.P.R.A. sec. 3116. Al igual que los otros partidos políticos principales, este dinero puede ser utilizado en sus actividades administrativas de campaña y propaganda política, incluyendo primarias. 16 L.P.R.A. sec. 3118. Aunque algunos quieran negarlo, repetimos, el proceso primarista sobre candidatos a las elecciones presidenciales en los Estados Unidos solamente es compatible con la tesis que acepta y promueve la estadidad o la autonomía. Es irreconciliable con el ideal de la independencia. La promulgación por la Asamblea Legislativa de la Ley de

Primarias Presidenciales Compulsorias y la creación y recono-
cimiento de agrupaciones locales como afiliados a los partidos
nacionales en Estados Unidos choca contra la tesis política
principal del demandante-apelado Partido Independentista
Puertorriqueño. Para la campaña de orientación e informa-
ción por la Comisión Estatal de Elecciones la Asamblea
Legislativa proveyó los fondos aquí impugnados, sin embargo,
dejó de equiparar a los electores que componen la minoría
independentista con fondos públicos para oponerse a la
participación de tales primarias. En consecuencia, dicha
minoría se ha visto forzada a hacer uso de sus economías
provenientes de las aportaciones de sus propios miembros y
del fondo electoral. Como corolario, de haberse sostenido el
uso de fondos públicos en las primarias, en los próximos
comicios electorales del país en noviembre de 1980, la
paridad económica visualizada en la Ley Electoral en virtud
de fondos públicos tendería a desaparecer. Los electores de
los partidos políticos principales que propulsan la estadidad
federada o autonomía hubiesen llevado una ventaja pecuniaria
sobre la minoría independentista.

Nuestra decisión no queda afectada por el Art. 32 de la
Ley:

"Interpretación de los Resultados de las Primarias Presiden-
ciales. Siempre que los procedimientos de primarias presidenciales
sean administrados e implementados desde su inicio hasta cumpli-
mentación final por el Administrador Estatal de Elecciones, ni el
número de los participantes, ni los resultados de ningún otro
elemento del proceso de las mismas y/o demás procedimientos que
se lleven a tenor con lo dispuesto en esta ley podrá ser oficialmente
interpretado por el Gobierno de Puerto Rico para propósito alguno
como indicador en relación con las preferencias que tenga o pueda
tener nuestro pueblo o un sector del mismo en cuanto al asunto del
status político, ni en cuanto a la dirección, si alguna, por la cual deba
o pueda encaminarse Puerto Rico en términos de cambios a su
actual status."

La campaña publicitaria y de propaganda partidista que
generan las primarias y la forma en que la simple participa-
ción la han vinculado como un paso hacia la estadidad una

mayoría de los candidatos presidenciales y un número sustancial de los dirigentes de los partidos políticos afiliados, anula el texto de ley antes transcrito. La norma de hermenéutica legislativa choca contra la realidad viva y los pronunciamientos constantes y en contrario de sus autores principales. Es una utopía la abstracción del proceso primarista con el reclamo del ideal de estadidad o la autonomía.

Todas estas consideraciones nos mueven a concluir que la Ley de Primarias Presidenciales Compulsorias adolece de serias e infranqueables deficiencias constitucionales, cuya superación exige la realización de unos trámites no discriminatorios, rodeados de garantías igualitarias legales y económicas para que todos los sectores y electores cualificados del país puedan participar u oponerse. (13)

Ninguno de nuestros pronunciamientos debe entenderse como impedimento para que los electores puertorriqueños que así lo deseen participen, por su propio esfuerzo y pecunio, en la consulta y expresión sobre candidatos predilectos a la nominación de la presidencia por los partidos nacionales, al amparo de otras leyes que autorizan el uso de escuelas públicas y bajo la protección de los agentes de orden público en vista del número inmenso que eventos de esta magnitud conllevan.

---

(13) La subvención económica por el Estado a los partidos políticos no puede limitarse a aquellos que acuden a las urnas, sino que se extiende a los que predican la abstención electoral.

Es principio igualitario e incuestionable inherente a una democracia liberal que nutre su fuerza creadora de darle oportunidad al opositor.